**ON PETITION FOR REHEARING**

**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

JAMES EDWARD REID,
         *Petitioner-Appellant,*

v.

PAGE TRUE, Warden, Sussex I State
Prison,
         *Respondent-Appellee.*

No. 02-27

JAMES EDWARD REID,
         *Petitioner-Appellant,*

v.

PAGE TRUE, Warden, Sussex I State
Prison,
         *Respondent-Appellee.*

No. 03-2

Appeals from the United States District Court
for the Western District of Virginia, at Roanoke.
Samuel G. Wilson, Chief District Judge.
(CA-00-859-7)

Argued: May 8, 2003

Decided: August 26, 2003

Decided on Rehearing: October 8, 2003

Before WILKINS, Chief Judge, and GREGORY and
SHEDD, Circuit Judges.

Affirmed by published opinion. Chief Judge Wilkins wrote the opinion, in which Judge Gregory and Judge Shedd joined.

---

## COUNSEL

**ARGUED:** Marie Frances Donnelly, MIDWEST CENTER FOR JUSTICE, Evanston, Illinois, for Appellant. Katherine P. Baldwin, Senior Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellees. **ON BRIEF:** Clifford L. Harrison, James C. Turk, Jr., STONE, HARRISON & TURK, P.C., Radford, Virginia, for Appellant. Jerry W. Kilgore, Attorney General of Virginia, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellees.

---

## OPINION

WILKINS, Chief Judge:

James Edward Reid appeals a district court order denying his petition for a writ of habeas corpus, *see* 28 U.S.C.A. § 2254 (West 1994 & Supp. 2003), in which he challenged his conviction and death sentence for the murder of 80-year-old Annie Lester.[1] For the reasons set forth below, we affirm the rejection of Reid's claims by the district court.

### I.

Lester's body was discovered on October 12, 1996. She had been brutally murdered; an autopsy revealed that Lester had suffered 22 stab wounds. Lester had also been beaten about her head with a blunt instrument, and a bone in her throat had been crushed by strangulation or being struck with a hard object. A trail of blood led from Lester's kitchen to her bedroom, where her body was found. Lester's clothing

---

[1]Reid named Page True, Warden of Sussex I state prison, as Respondent. We refer to Respondent as "the State."

was in disarray, and the room had been ransacked. A bottle of wine was found on the floor at the foot of the bed.

Substantial evidence connected Reid to the murder. Reid was acquainted with Lester and had received an automobile ride to her house in the mid-morning of the day of the murder; on the way, he purchased a bottle of wine. Late in the afternoon, Reid was observed walking from the direction of Lester's house, drunk and covered in blood. The blood on Reid's clothing was later determined to be consistent with Lester's DNA. Reid's fingerprints were found in blood on the telephone in Lester's bedroom, his saliva was found on a cigarette butt left in the room, and his handwriting was found on pieces of paper in the house.

Reid, who claimed to have no memory of Lester's murder, subsequently entered an *Alford* plea to one count each of capital murder, attempted rape, and attempted robbery. *See North Carolina v. Alford*, 400 U.S. 25, 37 (1970) (holding that a defendant may plead guilty "even if he is unwilling or unable to admit his participation in the acts constituting the crime"). After a sentencing hearing, the trial judge imposed the death penalty, finding that the murder satisfied the vileness predicate of Virginia law. *See* Va. Code Ann. § 19.2-264.2 (Michie 2000) (permitting imposition of the death penalty if the court determines that the defendant's conduct in committing the murder "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim").

On direct appeal, Reid claimed that the trial court failed to consider uncontradicted mitigating evidence in reaching its sentencing determination. The Virginia Supreme Court characterized this argument as a "complaint that the trial court must not have considered [Reid's] mitigating evidence since the court imposed the death penalty" and rejected it, concluding that "the trial court did, in fact, consider Reid's mitigating evidence." *Reid v. Commonwealth*, 506 S.E.2d 787, 792 (Va. 1998). The United States Supreme Court thereafter denied Reid's petition for a writ of certiorari. *See Reid v. Virginia*, 528 U.S. 833 (1999).

Reid subsequently sought habeas relief in the Virginia Supreme Court, contending, as is relevant here, that his guilty plea was not

knowing and voluntary and that counsel were constitutionally ineffec-
tive for advising him to enter an *Alford* plea. The Virginia Supreme
Court denied relief, ruling that the first claim was defaulted and that
the second was without merit.

Reid filed this federal habeas petition on November 6, 2000, claim-
ing that counsel were constitutionally deficient for advising him to
enter an *Alford* plea, that his *Alford* plea was not knowing and volun-
tary, and that the trial court failed to consider mitigating evidence.
The district court denied Reid's motions for discovery and to expand
the record but conducted an evidentiary hearing to determine "what
Reid's trial counsel told him about the effect of his *Alford* pleas" and
"Reid's understanding about the effect of his *Alford* pleas." J.A. 379.
Following the hearing, the district court denied the petition, conclud-
ing that Reid's claims regarding counsel's ineffectiveness and the vol-
untariness of his plea were without merit and that Reid's claim
regarding consideration of mitigating evidence by the trial court was
procedurally defaulted.

## II.

Under the provisions of the Antiterrorism and Effective Death Pen-
alty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, an
individual cannot appeal a denial of collateral relief without first
obtaining a certificate of appealability (COA). *See generally* 28
U.S.C.A. § 2253(c) (West Supp. 2003). A COA "may issue . . . only
if the applicant has made a substantial showing of the denial of a con-
stitutional right" and must specify the issue or issues as to which the
COA has been granted. *Id.* § 2253(c)(2); *see id.* § 2253(c)(3).

Prior to oral argument, we granted a COA as to all issues. Thus,
the question of whether to issue a COA in this case is no longer
before us. We nevertheless take this opportunity to explain procedures
we have recently adopted for deciding when to certify issues for
appeal in collateral review cases. These procedures were initially
found in Standing Order 03-01, which this court adopted on May 9,
2003. On July 8, this order became new Local Rule 22(a). A copy of
the new rule is appended to this opinion.

## A.  *PROVISIONS OF THE NEW RULE*

Local Rule 22(a) divides appeals in collateral review cases into three categories. The first category includes all cases in which the appellant expressly requests a COA—or expansion of a COA, if the district court has already certified some issues for review—before this court enters its briefing order. In such cases, the court will review the request and (a) grant a COA and direct the parties to file briefs addressing the issues certified for review or (b) deny a COA and either dismiss the appeal—if the district court did not grant a COA— or direct the parties to file briefs regarding the issues certified by the district court (if the district court granted a COA).[2] *See* 4th Cir. R. 22(a)(1)(A), (2)(A).

The second category consists of cases in which the district court did not issue a COA and the appellant has not explicitly requested one from this court. In such cases, the notice of appeal will be treated as a request for a COA. *See* Fed. R. App. P. 22(b)(2). To guide its inquiry into whether to grant a COA, the court will enter a preliminary briefing order directing the appellant to file a brief addressing the merits of the claims the appellant wishes to raise. The court will then review that brief and determine whether to grant a COA as to any of the issues raised in the brief. Upon determining that the appellant has made the showing required by § 2253(c) as to any issue, the court will grant a COA as to that issue and enter a final briefing order directing the parties to complete the briefing process. If the appellant fails to make the required showing, the court will deny a COA and dismiss the appeal. *See* 4th Cir. R. 22(a)(1)(B).

---

[2]The rule does not require the district court to rule on a request for a COA prior to our consideration of a request. Although such rulings are helpful to this court, we have opted (for the present, at least) not to compel the participation of the district court in the COA process.

The rule also does not address the question of whether this court must examine a COA issued by the district court to ensure that the appellant has made the showing required by § 2253(c). The question of whether such review is appropriate has divided other circuits. *Compare United States v. Cepero*, 224 F.3d 256, 261-62, 267-68 (3d Cir. 2000) (en banc) (requiring review of district court COA), *with, e.g.*, *Ramunno v. United States*, 264 F.3d 723, 725 (7th Cir. 2001) (declining to follow *Cepero*).

The third category created by the new rule includes cases in which the district court granted a COA as to some issues and, as of the time for entering a briefing order, the appellant has not requested that the COA be expanded by this court. In such cases, the court will enter a standard briefing order directing the parties to brief the issues certified for review by the district court. The appellant may raise additional claims in his opening brief, but the court will not consider them unless the appellant files a separate statement noting that the brief contains claims beyond the scope of the COA issued by the district court. The statement need not be elaborate or contain any reasoning; its sole purpose is to notify this court of the appellant's desire to expand the COA. Upon receipt of such a statement, the court will stay further briefing and decide whether to expand the COA. Once the court makes its decision, it will lift the stay and allow the parties to complete the briefing process (as to all issues certified for review by either this court or the district court). *See* 4th Cir. R. 22(a)(2)(B).

Regardless of the category into which a case falls, matters concerning the grant or expansion of a COA will be referred to a three-judge panel. *See* 4th Cir. R. 22(a)(3). The panel will review the request to determine whether the appellant has made the showing required by § 2253(c) but will not consider the ultimate question of whether the claim has merit. If any member of the panel determines that the appellant has made the requisite showing as to any issue, the court will grant a COA as to that issue. *See id.*

Finally, the rule authorizes the court to request additional materials from any party. *See* 4th Cir. R. 22(a)(4). The rule is silent on the question of whether the court may accept unsolicited materials;[3] in light of this silence, we conclude that the rule neither expands nor impairs the discretion that the panel would otherwise possess.

### B.  *REASONS FOR ADOPTING THE NEW RULE*

The primary impetus for the adoption of Rule 22(a) was the recent decision of the Supreme Court in *Miller-El v. Cockrell*, 123 S. Ct.

---

[3]The commentary notes that the appellant may file an express request for a COA along with the opening brief. *See* 4th Cir. R. 22(a)(1)(B), note.

1029 (2003). The petitioner in *Miller-El* was a state prisoner seeking relief under § 2254. *See id.* at 1036. The district court denied the prisoner's application and denied a COA, *see id.*, and the court of appeals likewise denied a COA, stating that "'the state court's adjudication neither resulted in a decision that was unreasonable in light of the evidence presented nor resulted in a decision contrary to clearly established federal law as determined by the Supreme Court,'" *id.* (quoting *Miller-El v. Johnson*, 261 F.3d 445, 452 (5th Cir. 2001)). The Supreme Court reversed, concluding that the court of appeals improperly conducted a full inquiry into the merits before deciding whether to grant a COA. *See id.* at 1042. The Court held that § 2253(c) permits only "a general assessment of the[ ] merits" of the claims in a habeas petition and admonished that "[w]hen a court of appeals side steps this process by first deciding the merits of an appeal, and then justifying its denial of a COA based on its adjudication of the actual merits, it is in essence deciding an appeal without jurisdiction." *Id.* at 1039.

Prior to *Miller-El*, we did not have a mechanism for separating the COA determination from the decision on the merits, and it was our custom to undertake both inquiries simultaneously, after the case was fully briefed. This practice did not prejudice appellants; on the contrary, it is likely that we afforded full review in many appeals that should have been dismissed for failure to satisfy the threshold requirements of § 2253(c). Nonetheless, the practice was not in strict compliance with the statute. *See In re Fowlkes*, 326 F.3d 542, 546 (4th Cir. 2003).

The new local rule brings our practice into conformity with § 2253(c). Under the rule, we will conduct the COA inquiry before completing the briefing process and deciding the case on its merits. This remains true even though, in cases falling into the second and third categories described above, our decision respecting a COA will be informed by our review of the appellant's brief on the merits, rather than a separate request for a COA. In examining these briefs at the COA stage, we will not engage in "full consideration of the factual or legal bases adduced in support of the claims," *Miller-El*, 123 S. Ct. at 1039, but will instead conduct the cursory review necessary to identify "those appeals deserving of attention" while dismissing claims that "plainly do not" deserve further review, *id.* at 1040.

This procedure advances the goals of the AEDPA more effectively than either requiring a separate request for a COA or acting without any request other than the notice of appeal. The purpose of the AEDPA was "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases." *Woodford v. Garceau*, 123 S. Ct. 1398, 1401 (2003). Requiring a separate request for a COA before ordering briefing would *add* delay to habeas litigation. Moreover, such delays would not be offset by the benefit of clearer guidance for our COA inquiry; in our experience, few appellants file separate requests for a COA, and those who do generally rely on their briefs with little or no embellishment.[4] And, while we could examine the record ourselves without any indication of what claims the appellant desires to present to us, doing so would add to our own burdens and would not give effect to the requirement that "*the applicant* [make] a substantial showing of the denial of a constitutional right." 28 U.S.C.A. § 2253(c)(2) (emphasis added). For these reasons, we have adopted the rule described above, which allows us to use a single document as both the appellant's request for a COA and the appellant's brief on the merits, even as we maintain a clear distinction between the COA and merits phases of the appeal.

### III.

We first consider Reid's claim that his *Alford* plea was invalid due to the ineffectiveness of defense counsel. Reid maintains that counsel were ineffective for (1) failing to investigate and advise Reid concerning a defense of voluntary intoxication; (2) failing to investigate and advise Reid regarding a defense of insanity; and (3) failing to advise Reid concerning the nature and consequences of an *Alford* plea.

In order to establish that his constitutional right to the effective

---

[4]Our prior practice of ordering full briefing before deciding whether to grant a COA may have encouraged parties to rely on their briefs to support their requests for a COA. We believe, however, that neither *Miller-El* nor our rule increases the incentive for an appellant to augment his brief with additional arguments in support of certification; thus, we may infer from the lack of such arguments in the past that, were we to require a separate request for a COA, we would see substantially identical arguments at the COA stage and the briefing stage.

assistance of counsel was violated, Reid must make a twofold showing. *See Wiggins v. Smith*, 123 S. Ct. 2527, 2535 (2003). First, he must demonstrate that his attorneys' "representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). "Judicial scrutiny of counsel's performance must be highly deferential," and "every effort [must] be made to eliminate the distorting effects of hindsight . . . and to evaluate the [challenged] conduct from counsel's perspective at the time." *Id.* at 689.

Reid must also demonstrate that he was prejudiced by his attorneys' ineffectiveness, *i.e.*, "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In the context of a guilty plea, a demonstration of prejudice requires Reid to establish "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). In *Hill*, the Supreme Court explained that this prejudice inquiry is quite similar to the inquiry for prejudice under *Strickland*, in that the question of whether counsel's ineffectiveness prejudiced a petitioner's guilty plea will often turn on an assessment of the likelihood of success of a particular investigation or strategy. *See id.* at 59.

## A. *STANDARD OF REVIEW*

Because this claim was adjudicated on the merits by the Virginia Supreme Court, our review is limited to determining whether the decision of that court "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C.A. § 2254(d)(1).[5] As is particularly rele-

---

[5]Reid argues that this standard does not apply because the district court held an evidentiary hearing. In support of this proposition, he relies on *Miller v. Champion*, 161 F.3d 1249, 1254 (10th Cir. 1998), in which the Tenth Circuit held that a federal habeas court need not defer to the factual findings of the state court if those findings were made without benefit of a hearing. Even assuming that *Miller* is correct, *but see Valdez v. Cockrell*, 274 F.3d 941, 950-51 (5th Cir. 2001), *cert. denied*, 123 S. Ct. 106 (2002), that rule does not apply here, because there were no state court factual findings at all with respect to Reid's ineffective assistance claim.

vant here, a state court decision is "contrary to" Supreme Court precedent in either of two situations: (1) when "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or (2) when "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Court's] precedent." *Williams v. Taylor (Williams II)*, 529 U.S. 362, 405-06 (2000).

Reid maintains that the decision of the Virginia Supreme Court on his ineffective assistance claim was contrary to Supreme Court precedent because it must be presumed that the state court applied its ruling in *Williams v. Warden (Williams I)*, 487 S.E.2d 194 (Va. 1997). In *Williams I*, the Virginia Supreme Court held that a habeas petitioner cannot prevail on an ineffective assistance claim simply by making the showing required under *Strickland*; rather, the court held that the petitioner must additionally demonstrate that "'the result of the proceeding was fundamentally unfair or unreliable.'" *Williams I*, 487 S.E.2d at 198 (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)). The Supreme Court subsequently declared that this standard was contrary to the clearly established law of *Strickland*. *See Williams II*, 529 U.S. at 393-95, 397; *id.* at 413 (opinion of O'Connor, J.) ("[T]he Virginia Supreme Court's decision was contrary to . . . clearly established federal law to the extent it held that our decision in [*Lockhart*] somehow modified or supplanted the rule set forth in *Strickland*.").

As noted above, the Virginia Supreme Court rejected Reid's ineffective assistance claim summarily, without providing any reasoning for the decision. Reid maintains that because this decision was made after the Virginia Supreme Court decided *Williams I*, but before the United States Supreme Court decided *Williams II*, it must be presumed that the state court applied an incorrect standard.

It is not at all clear that this is a tenable assumption. During the interim between *Williams I* and *Williams II*, the Virginia Supreme Court decided at least two published opinions regarding claims of ineffective assistance without referring to *Lockhart*. *See Moore v. Hinkle*, 527 S.E.2d 419, 423, 425-26 (Va. 2000); *see also Curo v. Becker*, 493 S.E.2d 368, 370-71 (Va. 1997) (not mentioning *Lockhart* when setting forth standard for ineffective assistance claim). *But see*

*Pender v. Angelone*, 514 S.E.2d 756, 757 (Va. 1999) (citing *Lockhart* for the proposition that "[t]he [*Strickland*] prejudice analysis includes a focus on whether the result of the proceeding was fundamentally unfair or unreliable" (internal quotation marks omitted)).

In any event, Reid's position cannot be squared with the way this court applies the § 2254(d)(1) standard when the state court has not articulated the rationale for its decision. "In such cases, we conduct an independent examination of the record and the clearly established Supreme Court law, but we must still confine our review to whether the court's determination resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law . . . ." *Bell v. Jarvis*, 236 F.3d 149, 158 (4th Cir. 2000) (en banc) (citations & internal quotation marks omitted). In other words, when the state court does not articulate a rationale for its decision, our analysis focuses solely on the result reached, and application of the "contrary to" prong is necessarily limited to determining whether the state court decision is contrary to a decision reached by the Supreme Court on indistinguishable facts. *Cf. Early v. Packer*, 123 S. Ct. 362, 365 (2002) (holding that failure to cite federal law does not mean that state court decision was contrary to established federal law; state court need not even be aware of Supreme Court precedents, "so long as neither the reasoning nor the result of the state-court decision contradicts them"). Reid does not contend that the state court rejection of his ineffective assistance claim is "contrary to" Supreme Court precedent in this way. Accordingly, we turn to the question of whether the denial of relief by the state court on this claim is consistent with a reasonable application of Supreme Court precedent.

## B. *MERITS*

### 1. *Voluntary Intoxication*

Reid first contends that counsel failed to adequately investigate, consider, and advise him concerning a defense of voluntary intoxication. Under Virginia law, voluntary intoxication does not excuse any crime. *See Wright v. Commonwealth*, 363 S.E.2d 711, 712 (Va. 1988). "However, when a person voluntarily becomes so intoxicated that he is incapable of deliberation or premeditation, he cannot commit a class of murder that requires proof of a deliberate and premeditated

killing." *Id.* In determining whether the evidence supports a voluntary intoxication defense, Virginia courts look to the defendant's behavior before and after the offense. *See, e.g.*, *Giarratano v. Commonwealth*, 266 S.E.2d 94, 99 (Va. 1980). Relevant behaviors include attempts to conceal the crime, *see id.* at 100 (noting that defendant killed second person in order to conceal first murder); a lapse of time between ingestion of intoxicants and the crime, *see Hedrick v. Warden*, 570 S.E.2d 840, 851 (Va. 2002); whether the conduct of the defendant was "planned and purposeful," *id.*; and whether the defendant was able to engage in complex behaviors such as operating an automobile, *see Lilly v. Commonwealth*, 499 S.E.2d 522, 536 (Va. 1998), *rev'd on other grounds*, 527 U.S. 116 (1999).

Reid correctly points out that some of these factors support a claim of voluntary intoxication in his case. For example, Reid's consumption of alcohol was contemporaneous with the crime. According to Reid's recollection of events, while visiting with Lester he periodically went outside to smoke, and while outside he drank from the bottle of wine he purchased on the way to Lester's home. And, the bottle was found near Lester's body. Additionally, Reid made no attempt to conceal the fact that he had been involved in some kind of violent incident. He emerged from Lester's house covered in blood, staggering and obviously drunk.[6] He approached George Eanes and Eanes' father,[7] who were complete strangers to him, and asked for a ride to his house. Such behavior arguably indicates that Reid was so intoxicated as to be unaware of what had happened in Lester's home, a finding that would, in turn, support a determination that Reid had been too drunk to premeditate or act deliberately.[8]

Two experts who examined Reid (and who later testified during the sentencing phase) provided reports to counsel indicating that Reid may have been too intoxicated to form the necessary intent to commit premeditated murder. Doctor Pogos Voskanian concluded that Reid's

---

[6]Various witnesses reported that Reid was obviously drunk for many hours after the murder.

[7]Eanes and his father operated a body shop near Lester's home.

[8]In considering whether Reid was aware of what had gone on in Lester's home, however, a factfinder would also have to consider Reid's statement to Eanes' father that he had been in a fight over drugs.

history of brain injury,[9] combined with various other ailments suffered by Reid and "exacerbated by an acutely intoxicated state[,] is likely to have a devastating effect on one's judgment, appreciation of reality, ability to resist impulses, ability to form rational decisions and perform intentional acts." J.A. 72. More specifically, Dr. Voskanian asserted that "Reid's functioning and ability to act intentionally at the time of the alleged offense[ were] markedly impaired" and that "Reid's capacity to form an intent for a criminal act was substantially compromised." *Id.* at 72-73. Doctor Stephen Herrick reached a similar conclusion, stating that Reid's "behavior following the crime would suggest[ ] he did not understand the nature, character, or consequences of the alleged offense" and that "[i]n general the description of his behavior suggests extreme cognitive impairment." *Id.* at 104.

On the other hand, there is strong evidence that Reid was capable of planned and purposeful conduct. Forensic evidence indicated that Reid first bludgeoned Lester with a milk can in the kitchen. He then dragged her to the bedroom, where he stabbed her with a pair of sewing scissors (which he apparently obtained from the living room) and

---

[9]Reid was involved in a serious automobile accident in 1968. He suffered a major head trauma and was in a coma for at least five days (some medical records state that the coma lasted two weeks). The accident and coma marked the onset of a seizure disorder that has plagued Reid throughout his adult life. Although he can take Dilantin to control the seizures, he often fails to take his medication. The coma caused significant brain damage, and the subsequent seizures have exacerbated the effects of this injury.

In addition to the head trauma and seizures, Reid's mental functioning is also affected by his lengthy history of alcoholism. By the same token, Reid's brain damage affects his behavior as an alcoholic. Both experts determined that Reid was a binge drinker: he would be sober most of the time, but would go on a drinking spree at the beginning of each month when he received his disability check. Because Reid did not drink alcohol on a daily basis, he did not develop a tolerance for it the way most alcoholics do. Additionally, the damage to Reid's brain heightens the effect of alcohol on his perception. The net result is that Reid becomes substantially more impaired than does an average person who has consumed the same amount of alcohol. Family members supported this theory, stating that Reid would become noticeably intoxicated from a single beer.

strangled her with the cord of a heating pad. Reid's selection of three different weapons indicates a capacity for coherent, deliberative thought that is inconsistent with a voluntary intoxication defense. Also, Reid wrote "I've gotta kill you" on a card while he was in Lester's house. J.A. 616 (internal quotation marks omitted). Reid apparently told the probation officer who wrote his presentence report that his last memory from Lester's house was of writing something on the card.[10]

According to affidavits submitted by trial counsel, several strategic considerations played into the decision not to pursue a voluntary intoxication defense. First, counsel's experience indicated to them that a jury would not be receptive to such a defense. And, after consultation with others experienced in capital litigation, counsel determined that Reid should avoid a jury if at all possible because, given the facts of the crime, a jury was likely not to be favorable to Reid. Since the prosecutor indicated that he would refuse to waive a jury trial if Reid pleaded not guilty, the only way to accomplish this goal was to enter some form of guilty plea. And, the judge to whom Reid's case was assigned had previously imposed a life sentence in a capital murder prosecution that involved facts that were, in counsel's view, more egregious than those here.

In short, the evidence to support a voluntary intoxication defense was, at best, conflicting, and sound strategic considerations weighed against presenting such a defense. In view of these circumstances, it was not unreasonable for the Virginia Supreme Court to conclude that

---

[10]Other evidence of premeditation and deliberation was not as strong. For example, approximately one week before the murder, Reid stated that he wanted to kill all the African American women in Christiansburg. While this statement alone indicates premeditation of the murder of Lester, who was African American, other evidence indicated that Reid commonly made such statements when drunk and that he did not remember them when sober.

Additionally, the State maintains that the fact that Reid smoked cigarettes and made telephone calls while in Lester's house shows premeditation. This assertion rests largely on the State's contention that Reid paused during the murder to perform these acts; however, there is no evidence to support the State's theory.

counsel were not ineffective for advising against a defense of voluntary intoxication.

### 2. *Insanity*

Reid next contends that counsel failed to adequately investigate and advise him regarding an insanity defense. "Virginia law recognizes two tests by which an accused can establish criminal insanity, the M'Naghten Rule and the irresistible impulse doctrine." *Bennett v. Commonwealth*, 511 S.E.2d 439, 446 (Va. Ct. App. 1999). In either case, the defendant bears the burden of proving that he was insane at the time of the offense. *See Vann v. Commonwealth*, 544 S.E.2d 879, 882-83 (Va. Ct. App. 2001). "When the *corpus delicti* has been established and proof adduced that the accused committed the act, it is not sufficient for the accused to raise a reasonable doubt as to his sanity; he must go one step further and prove to the satisfaction of the jury that he was insane at the time of the commission of the act." *Wessells v. Commonwealth*, 180 S.E. 419, 422 (Va. 1935).

The M'Naghten Rule requires the defendant to prove that, because of a disease of the mind, he either did not know the nature and quality of his act or did not know that the act was wrong. *See Price v. Commonwealth*, 323 S.E.2d 106, 108-09 (Va. 1984); *see also id.* at 110 (noting that "the actual *M'Naghten* test for insanity, *stated in the disjunctive*, is the rule in Virginia" (emphasis added)). As the Virginia Supreme Court explained in *Price*,

> The first portion of M'Naghten relates to an accused who is psychotic to an extreme degree. It assumes an accused who, because of mental disease, did not know the nature and quality of his act; he simply did not know what he was doing. For example, in crushing the skull of a human being with an iron bar, he believed that he was smashing a glass jar. The latter portion of M'Naghten relates to an accused who knew the nature and quality of his act. He knew what he was doing; he knew that he was crushing the skull of a human being with an iron bar. However, because of mental disease, he did not know that what he was doing was wrong. He believed, for example, that he was carrying out a command from God.

*Id.* at 110 (internal quotation marks omitted).

"The irresistible impulse defense is available when the accused's mind has become so impaired by disease that he is totally deprived of the mental power to control or restrain his act." *Bennett*, 511 S.E.2d at 447 (internal quotation marks omitted). Impulsivity is the essence of this definition of insanity; planning or deliberative conduct is inconsistent with the defense. *See Vann*, 544 S.E.2d at 883.

Reid argues that the reports of Drs. Herrick and Voskanian should have alerted counsel to the viability of an insanity defense. We disagree. It is true, as Reid notes, that both doctors concluded that Reid suffered from a mental defect in the form of brain damage stemming from the automobile accident and ensuing coma in 1968 and the seizure disorder. However, neither doctor reached conclusions that would support a finding of insanity under the M'Naghten Rule or the irresistible impulse test. In fact, Dr. Herrick concluded that, while Reid's "behavior following the crime . . . suggested he did not understand the nature, character, or consequences of the alleged offense," J.A. 104, Reid's inability to remember the offense and the lack of an eyewitness resulted in "insufficient evidence" to support a conclusion that Reid was legally insane at the time of the murder, Supp. App. to State's Br. at 51. Likewise, neither doctor concluded that Reid had totally lost the ability to control his actions, as required by the irresistible impulse test. They merely opined that his ability to do so was impaired. While such impairment is a mitigating factor for sentencing, it does not establish the existence of insanity under Virginia law.

### 3.   *Nature of an Alford Plea*

Finally, Reid contends that counsel were constitutionally ineffective for failing to ensure that he understood the nature of an *Alford* plea.[11] The district court held a hearing on this portion of the ineffec-

---

[11]In connection with this claim, Reid argues that one of his attorneys misrepresented his experience with capital cases and was in fact not qualified to serve as lead counsel in a capital case. Even accepting Reid's allegations as true, the fact remains that, for the reasons explained in the text, counsel were not constitutionally defective.

tive assistance claim. During the hearing, Reid testified that trial counsel urged him to make the *Alford* plea, telling him that the worst sentence he could receive under such a plea would be life without parole and that he might even be eligible for "geriatric parole." J.A. 395. Reid further asserted that counsel failed to explain to him that an *Alford* plea was a guilty plea and that counsel told him he would be ineligible for the death penalty under such a plea. This testimony was contradicted by one of Reid's attorneys,[12] who testified that he and his co-counsel explained the nature of an *Alford* plea to Reid and members of his family.[13]

---

Reid offered additional evidence of counsel's ineffectiveness in a motion to vacate the judgment pursuant to Federal Rule of Civil Procedure 60(b), filed on the day he filed a notice of appeal from the ruling of the district court. The new evidence consisted of an order of the disciplinary board of the Virginia state bar directing the attorney to change his status to "disabled." This ruling was based, in part, on misrepresentations by the attorney that were related to Reid's case. The district court denied the motion to vacate, Reid appealed, and that appeal was consolidated with this proceeding.

It is not clear whether Reid's motion was a proper Rule 60(b) motion or, rather, should have been treated as an application for leave, pursuant to 28 U.S.C.A. § 2244(b) (West Supp. 2003), to file a second or successive habeas application. *See United States v. Winestock*, ___ F.3d ___, 2003 WL 1949822, at *6 & n.6 (4th Cir. Apr. 25, 2003). Regardless of how the motion is construed, however, Reid is not entitled to relief.

[12]Reid's other attorney did not testify at the hearing.

[13]Reid contends that counsel's testimony could not possibly be true because counsel himself did not understand the nature of an *Alford* plea. In support of this contention, Reid points to the fact that following the prosecution's presentation of evidence, counsel moved to strike the robbery charge on the basis that it was not supported by sufficient evidence. Reid argues that counsel should have known that the motion was improper because the trial court had already accepted Reid's guilty plea to the robbery charge. Counsel testified, however, that he made the motion because he felt there was nothing to lose by doing so. Additionally, it is worth noting that the impropriety of the motion was not immediately apparent to the trial court. *See* Transcript, Dec. 4, 1997, at 219 (responding to prosecution's objection to motion to strike, "Well, I think they can still make a motion and the Court will rule on that motion . . . .").

The attorney's testimony was corroborated by a letter written by the attorney and signed by Reid shortly before his plea. In pertinent part, the letter stated:

> We have . . . advised you that you have a right to enter a plea of not guilty, guilty, no contest or enter [an] Alford plea. . . . [Y]ou understand by pleading guilty, no contest or Alford plea you may lose significant rights to appeal and your right to a jury trial. . . .
>
> We have all fully discussed how to proceed with this case and [we] have advised you we believe it is best to enter an Alford Plea wherein you do not admit guilt but concede the Commonwealth has enough evidence against you for a conviction.
>
> We are therefore going to enter an Alford plea and present evidence on your behalf in mitigation of the offenses to hopefully avoid a death sentence.

Supp. App. to State's Br. 65-66. Moreover, during his plea colloquy Reid informed the judge that he understood the charges against him and his plea options and that he had "decided for [him]self" to enter an *Alford* plea. *Id.* at 3. Reid also responded affirmatively to the question of whether he understood that he could receive the death penalty.

Based on the foregoing evidence, the district court found that Reid's counsel had adequately explained to him the nature of an *Alford* plea and its consequences, and the court discredited Reid's contrary testimony. These findings are not clearly erroneous. And, in light of these findings, this aspect of Reid's challenge to counsel's effectiveness must fail.

### IV.

Reid next contends that because he did not understand what an *Alford* plea was or that he could face the death penalty under such a plea, his plea was not knowing and voluntary. Reid faults the trial court for failing to inquire adequately into whether Reid understood

the charges against him and for not assessing the impact of Reid's mental deficiencies on his competence to plead guilty. Reid presented this claim for the first time in his state habeas petition, and the Virginia Supreme Court concluded that the claim was defaulted under the rule of *Slayton v. Parrigan*, 205 S.E.2d 680, 682 (Va. 1974) (holding that claims not properly raised on direct appeal will not be considered as a basis for collateral relief).

Absent cause and prejudice or a miscarriage of justice, a federal habeas court may not review a constitutional claim when a state court has declined to consider its merits on the basis of an adequate and independent state procedural rule. *See Harris v. Reed*, 489 U.S. 255, 262 (1989). Reid maintains that *Slayton* is not an "adequate" state procedural rule, and thus cannot serve as a basis for a procedural default. Alternatively, Reid argues that he has established cause and prejudice or a miscarriage of justice, such that the default must be excused and the merits of his claim considered.

## A.    *ADEQUACY OF SLAYTON*

A state procedural rule is adequate if it is consistently or regularly applied. *See Johnson v. Mississippi*, 486 U.S. 578, 587 (1988). Consistent or regular application of a state rule of procedural default "does not mean undeviating adherence to such rule admitting of *no* exception." *Meadows v. Legursky*, 904 F.2d 903, 907 (4th Cir. 1990) (en banc). Rather, "despite some deviations, a general rule[ ] that ha[s] been applied in the vast majority of cases" must be considered adequate. *Plath v. Moore*, 130 F.3d 595, 602 (4th Cir. 1997) (internal quotation marks omitted). In assessing whether a state has consistently applied a procedural rule, we consider only those instances in which the state advanced the procedural rule as a basis for a decision adverse to the petitioner, because we cannot say that a state court inconsistently applied a procedural rule that was not presented for its consideration. *See Meadows*, 904 F.2d at 907. Furthermore, we necessarily look only to the period prior to the time the defendant violated the state procedural rule; decisions applying or declining to apply a state rule after that time are irrelevant in determining whether the rule was consistently applied at the critical time. *See id.* at 907 & n.3.

We have previously determined that *Slayton* is an adequate state procedural rule, *see Wright v. Angelone*, 151 F.3d 151, 159-60 (4th

Cir. 1998), and we are not at liberty to revisit that ruling, *see Etheridge v. Norfolk & W. Ry. Co.*, 9 F.3d 1087, 1090 (4th Cir. 1993). However, the fact that a state procedural rule is adequate in general does not answer the question of whether the rule is adequate as applied in a particular case. *See Brown v. Lee*, 319 F.3d 162, 170 (4th Cir. 2003) (explaining that a procedural rule is inadequate when it has not been regularly or consistently applied "to a particular type of federal constitutional claim"). Answering that question requires us to determine whether *Slayton* is regularly and consistently applied to claims of the type raised by Reid. The relevant inquiry concerns the procedural posture of the defaulted claim: "The question we must ask . . . is whether the particular procedural bar is applied consistently to cases that are *procedurally* analogous—here, cases in which the particular claim raised could have been raised previously but was not." *McCarver v. Lee*, 221 F.3d 583, 589 (4th Cir. 2000). In order to demonstrate that *Slayton* is inadequate in this particular instance, Reid "would need to cite a non-negligible number of cases in which [involuntary plea] claims could have been brought on direct review but were not, and in which the collateral review court nonetheless failed to bar the claim under [*Slayton*]." *Id.*

Reid offers three cases purportedly demonstrating that the *Slayton* rule is not regularly or consistently applied in this particular context. *See Walton v. Angelone*, 321 F.3d 442 (4th Cir.), *cert. denied*, 123 S. Ct. 2626 (2003); *Chapman v. Angelone*, 187 F.3d 628, 1999 WL 511062 (4th Cir. 1999) (per curiam) (unpublished table decision); *Gardner v. Warden*, 281 S.E.2d 876 (Va. 1981). As Reid notes, all of these cases involved claims that a guilty plea was not knowing and voluntary, and in none of them did the Virginia Supreme Court bar the claim under *Slayton*. Nevertheless, these cases do not establish the inadequacy of *Slayton*. In *Walton*, the challenge to the guilty plea was defaulted on the basis of the procedural rule found in *Anderson v. Warden*, 281 S.E.2d 885, 888 (Va. 1981) (holding that a defendant is bound by representations made during a guilty plea absent a valid reason for controverting those statements). *See Walton*, 321 F.3d at 451 & n.6. We are aware of no requirement that a state court identify every potential basis for a procedural default, and Reid does not claim such a requirement exists. Moreover, there is no logical reason why the Virginia Supreme Court would need to invoke the *Slayton* bar to a claim ruled barred by the more specific rule in *Anderson*.

In *Chapman*, the state asserted that the petitioner's challenge to his guilty plea was defaulted under *Anderson*, and the Virginia Supreme Court dismissed an ineffective assistance of counsel claim on the basis of *Anderson*. *See Chapman*, 1999 WL 511062, at *2. However, the court did not rule at all, either procedurally or on the merits, on the petitioner's related claim that his guilty plea was not involuntary due to counsel's ineffectiveness. *See id. Chapman* thus does not help Reid.

In *Gardner*, the Virginia Supreme Court did not default a challenge to a guilty plea on the basis of *Anderson*, and in fact considered the merits of the claim on habeas review. Even so, this case does not provide the support that Reid needs to establish the inadequacy of *Slayton*. There is no indication anywhere in *Gardner* that the State asserted the *Slayton* bar. Therefore, it goes too far to read *Gardner* as rejecting application of *Slayton*. Even if this were a supportable reading of *Gardner*, a single failure to apply *Slayton* would not establish the inadequacy of the rule. *See McCarver*, 221 F.3d at 589.

### B.   *CAUSE AND PREJUDICE/MISCARRIAGE OF JUSTICE*

Reid may demonstrate cause by showing "that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Constitutionally deficient performance of appointed counsel is such a factor, *see id.*, and is the basis on which Reid seeks to establish cause. However, for the reasons discussed above, Reid's counsel were not ineffective with respect to his guilty plea.

A procedural default also may be excused if the petitioner demonstrates that "failure to consider the claim[ ] will result in a fundamental miscarriage of justice," *Coleman v. Thompson*, 501 U.S. 722, 750 (1991), *i.e.*, that "a constitutional violation has probably resulted in the conviction of one who is actually innocent," *Murray*, 477 U.S. at 496. In order to make this showing, a federal habeas petitioner must present new "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Schlup v. Delo*, 513 U.S. 298, 316 (1995).

Reid bases his actual innocence claim on the reports of his sentencing experts, Drs. Herrick and Voskanian, whose conclusions are discussed above. He offers no new evidence at all, and his assertion of actual innocence fails on this basis.

V.

Reid's final claim rests on statements made by the trial court when it pronounced Reid's sentence. Reid contends that the comments of the trial court indicate that it failed to consider the mitigating evidence Reid presented during the sentencing hearing, in violation of the Eighth Amendment. *See Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982) (explaining that the Eighth Amendment prohibits a sentencer from categorically refusing to consider mitigating evidence). Those comments are as follows:

> Before a sentence of death can be imposed upon you, the Commonwealth must prove certain aggravating circumstances beyond a reasonable doubt. *The Court has the duty to consider all such evidence, both favorable to you and unfavorable presented relative to this hearing* in ascertaining whether the crime of which you have been convicted is so atrocious that the death sentence should be imposed.

Supp. App. to State's Br. 11 (emphasis added). Reid argues that the use of the phrase "such evidence" refers to evidence concerning aggravating factors, which, he contends, establishes that the trial court considered evidence favorable to Reid only in terms of whether it negated the existence of an aggravating factor.

On direct appeal, Reid argued that the trial court must not have considered evidence regarding his medical conditions and his intoxication at the time of the offense, because if it had, it would have determined that the murder was not vile and that Reid therefore could not be sentenced to death. The Virginia Supreme Court rejected this claim, determining "that the trial court did, in fact, consider Reid's mitigating evidence." *Reid*, 506 S.E.2d at 792.

The State maintains that Reid failed to present his Eighth Amendment claim to the Virginia Supreme Court on direct appeal and that

it therefore was not properly exhausted. *See Picard v. Connor*, 404 U.S. 270, 275 (1971) (holding that constitutional claim must be "fairly presented" to state court in order to satisfy exhaustion requirement); *Mallory v. Smith*, 27 F.3d 991, 995 (4th Cir. 1994) ("[T]he exhaustion requirement demands that the petitioner do more than scatter some makeshift needles in the haystack of the state court record. The ground relied upon must be presented face-up and squarely . . . . Oblique references . . . will not turn the trick." (internal quotation marks omitted)). Because the claim would now be procedurally barred if presented to the state court, the State urges us to treat the claim as exhausted but defaulted. *See Gray v. Netherland*, 518 U.S. 152, 161-62 (1996).

Reid concedes that he did not explicitly raise an Eighth Amendment claim in the state court. He maintains, however, that the Virginia Supreme Court was adequately apprised of the claim by his reference to "constitutional requirement[s]," Supp. App. to State's Br. 19, and his citation of state law cases that, in turn, cited Supreme Court precedent. Even if this is true, the claim is without merit.

The trial court imposed sentence in an extemporaneous oral ruling. Pinpoint accuracy in phrasing is not a hallmark of such rulings, and should not be expected. There can be no question that the court was aware of a duty to consider evidence favorable to Reid; indeed, the mitigating circumstances were the subject of lengthy argument by Reid's counsel at two penalty-phase hearings. In view of these circumstances, we cannot say that the Virginia Supreme Court made an unreasonable determination in finding that the trial court did consider the mitigating evidence proffered by Reid. Therefore, we must deny relief. *See* 28 U.S.C.A. § 2254(d)(2).

## VI.

For the reasons set forth above, we conclude that the district court correctly denied Reid's petition for a writ of habeas corpus. We therefore affirm.

*AFFIRMED*

**Rule 22. Habeas Corpus and Section 2255 Proceedings**

**(a) Application for the Original Writ.** An application for a writ of habeas corpus must be made to the appropriate district court. If made to a circuit judge, the application must be transferred to the appropriate district court. If a district court denies an application made or transferred to it, renewal of the application before a circuit judge is not permitted. The applicant may, under 28 U.S.C. § 2253, appeal to the court of appeals from the district court's order denying the application.

**(b) Certificate of Appealability.**

(1) In a habeas corpus proceeding in which the detention complained of arises from process issued by a state court, or in a 28 U.S.C. § 2255 proceeding, the applicant cannot take an appeal unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c). If an applicant files a notice of appeal, the district judge who rendered the judgment must either issue a certificate of appealability or state why a certificate should not issue. The district clerk must send the certificate or statement to the court of appeals with the notice of appeal and the file of the district-court proceedings. If the district judge has denied the certificate, the applicant may request a circuit judge to issue the certificate.

(2) A request addressed to the court of appeals may be considered by a circuit judge or judges, as the court prescribes. If no express request for a certificate is filed, the notice of appeal constitutes a request addressed to the judges of the court of appeals.

(3) A certificate of appealability is not required when a state or its representative or the United States or its representative appeals.

***Local Rule 22(a). Certificates of Appealability.***

*(1) The following procedures apply in cases in which the district court has not granted a certificate of appealability ("certificate"):*

*(A) The appellant may submit a request for a certificate with the Court of Appeals specifying the issues on which the appellant seeks authorization to appeal and giving a statement of the reasons why a certificate should be issued. The request shall be submitted either in the form prescribed by Fed. R. App. P. 27 for motions or on a form provided by the clerk. The clerk shall refer the request and other relevant materials to a three-judge panel. If the panel denies a certificate, the appeal will be dismissed. If the panel grants a certificate, the clerk shall enter a briefing order specifying the issues the Court will review.*

> NOTE: Subsection (1)(A) allows an appellant to request a certificate before a briefing order is entered. With respect to the form of the request, the Rule largely tracks former Fourth Circuit Rule 22(a).
>
> Because briefing orders are entered promptly after the appeal is docketed, this subsection is likely to affect relatively few appellants. However, when an appellant does file a request before a briefing order is entered, the most efficient course for the Court is to consider that request without waiting for a brief.

*(B) If no express request for a certificate has been filed pursuant to Subsection (1)(A) of this Rule, the notice of appeal will be treated as a request for a certificate. See Fed. R. App. P. 22(b)(2). To assist the Court in resolving this request, the clerk shall enter a Preliminary Briefing Order directing the appellant to file a brief on the merits and, if required by applicable rules, an appendix. The Preliminary Briefing Order shall neither require nor authorize a brief from the appellee, nor shall it make any statement regarding a reply brief by the appellant, but in all other respects it shall be substantially identical to a standard briefing order entered pursuant to Local Rule 31(b) or Local Rule 34(b), as appropriate. The clerk shall refer the appellant's brief and other relevant materials to a three-judge panel for a*

*determination of whether the appellant has made a substantial showing of the denial of a constitutional right as to any claim presented in the brief. If the panel denies a certificate, the appeal will be dismissed. If the panel grants a certificate, the clerk shall enter a Final Briefing Order stating that a certificate has been granted and directing the appellee to file a brief addressing the issue or issues that the Court has accepted for review, and providing for the filing of a reply brief by the appellant.*

> NOTE: Subsection (1)(B) sets forth the procedures that are likely to be followed in most cases. Under these procedures, the Court, having not received any request for a certificate, will direct the appellant to file a brief on the merits. Although not expressly stated in the Rule, the appellant may also file a separate request for a certificate along with his brief; this ensures that the appellant will not be prevented from making arguments relating to the certificate that are separate from the arguments on the merits. Regardless of whether a separate request is filed, the Court will look at the brief but will not use it to make a final decision; instead, as stated in this section, the Court will only determine whether the appellant has made the showing required by 28 U.S.C. § 2253(c)(2). If a certificate is granted, the Court will enter an order directing the appellee to file a brief addressing the issues the Court has accepted for review.

*(2) The following procedures apply in cases in which the district court has granted a certificate of appealability as to at least one issue:*

*(A) The appellant may submit a request for a certificate as to additional issues, along with a statement of the reasons why the expanded certificate should be issued. The request shall be submitted either in the form prescribed by Fed. R. App. P. 27 for motions or on a form provided by the clerk. The clerk shall refer the request and other relevant materials to a three-judge panel. After the panel has granted or denied such a request, the clerk shall enter a briefing order directing the parties to file briefs addressing the issues the Court will review.*

NOTE: Section (2) of this Rule parallels Section (1). Just as Section (1) prescribes separate procedures depending on whether the appellant files a request for a certificate before a briefing order is entered, Section (2) makes different provisions depending on whether a request to expand the certificate is filed before a briefing order is entered.

Subsection (2)(A) addresses the situation in which the request is filed, and provides that the request will be considered before the Court enters its briefing order. In both language and effect, this section is substantially identical to Subsection (1)(A) of the Rule.

*(B) If no express request to expand the certificate has been filed pursuant to Subsection (2)(A) of this Rule, the clerk shall enter a briefing order directing the parties to file briefs addressing the issues certified for review by the district court. If the appellant's brief on the merits addresses issues beyond the scope of the certificate granted by the district court, this Court will not review those additional issues unless the appellant files, simultaneously with the brief on the merits, a statement containing the names of the parties, the case number, and a list of the issues that the appellant wishes to add to the certificate. Such statement may also, but need not, present reasons why the certificate should be expanded. Upon receipt of the statement, the clerk shall suspend briefing and refer the brief, the statement, and other relevant materials to a three-judge panel. Once the panel has determined whether to expand the certificate, the clerk shall enter a Final Briefing Order specifying the issue or issues the Court will review.*

NOTE: Subsection (2)(A) governs the situation in which the district court grants a certificate as to some issues and the appellant wishes to raise additional issues but does not request expansion of the certificate before a briefing order is entered. Under this subsection, the appellant must brief all the issues he wishes to raise and then file a separate statement identifying the issues he has addressed that were not certified by the district court. If the appellant does not file an appropriate statement, the Court will not review any issues beyond the scope of the certificate granted by the district court. *Cf. Valerio v. Crawford*, 306 F.3d 742, 764-65

(9th Cir. 2002) (en banc) (discussing circuit rule barring expansion of certificate absent express request). When, however, the appellant files a proper statement, the Court will suspend briefing and decide whether to expand the certificate before requiring the appellee to file its brief; this process parallels the process for granting a certificate *ab initio*, as described in Subsection (1)(B).

The purpose of the statement described in Subsection (2)(A) is to trigger the pause in the briefing process during which the Court will consider whether to expand the certificate. This pause will assist the Court in complying with *Miller-El v. Cockrell*, 123 S. Ct. 1029 (2003), by ensuring a separation between the certification inquiry and the final inquiry into the merits.

The statement required by this subsection need not be long or detailed in order to serve its underlying purpose. On the contrary, the Court will accept a simple list of issues addressed in the brief but not certified for review by the district court, although the appellant is also permitted to present a more extended discussion. The clerk may provide appellants with an explanation of the statement requirement along with a warning that failure to file an appropriate statement will result in forfeiture of all issues beyond the scope of the certificate granted by the district court.

*(3) A request to grant or expand a certificate, including a brief filed pursuant to Subsection (1)(B) of this Rule or a brief and statement filed pursuant to Subsection (2)(B), shall be referred to a panel of three judges. If any judge of the panel is of the opinion that the applicant has made the showing required by 28 U.S.C. § 2253(c), the certificate will issue.*

NOTE: Section (3) retains our current practice of referring requests for certification to three-judge panels. While Fed. R. App. P. 22(a) may afford the Court some flexibility in this matter, the use of three-judge panels is consistent with Fed. R. App. P. 27(c), which provides that a single judge

"may not dismiss or otherwise determine an appeal or other proceeding."

The authority for a single judge to issue a certificate derives from § 2253. *See* 28 U.S.C. § 2253(c)(1) (providing that certain appeals may not proceed "[u]nless a circuit justice or judge issues a certificate of appealability").

*(4) In considering a request to grant or expand a certificate, including a brief filed pursuant to Subsection (1)(B) of this Rule or a brief and statement filed pursuant to Subsection (2)(B), the panel or any judge of the panel may request additional submissions from either party.*

NOTE: This section allows the panel to either rule on a certificate based on the materials already received or seek additional information from the parties. Although the Rule does not limit panel discretion, it is likely that panels will seek additional submissions in relatively few cases and will instead issue (or expand) a certificate if the appellant has made a sufficient showing to justify further inquiry.

*(5) Notwithstanding any other statement within this Rule, whenever the Court appoints counsel for a pro se appellant, counsel shall have an opportunity to file a brief on the merits addressing all issues as to which the district court or this Court has granted a certificate, unless the Court directs otherwise.*

NOTE: This section reflects our current practice of ordering a second round of briefing whenever the Court appoints counsel in a pro se case. This section will prevent any inference that the new Rule has either altered that practice or reduced the discretion of the Court to follow a different procedure in a particular case.

**Local Rule 22(b). Death Penalty Cases and Motions for Stay of Execution.**

*(1) **Statement Certifying Existence of Sentence of Death.** Whenever a petition for writ of habeas corpus or motion to vacate a federal*

*sentence in which a sentence of death is involved is filed in the district court or the Court of Appeals, the petitioner shall file with the petition a statement certifying the existence of a sentence of death and the emergency nature of the proceedings and listing any proposed date of execution, any previous cases filed by petitioner in federal court and any cases filed by petitioner pending in any other court. The clerk of the district court shall immediately forward to the Court of Appeals a copy of any such statement filed, and shall immediately notify by telephone the Court of Appeals upon issuance of a final order in that case. If a notice of appeal is filed, the clerk of the district court shall transmit the available record forthwith. The clerk of the Court of Appeals will maintain a special docket for such cases and these cases shall be presented to the Court of Appeals on an expedited basis.*

*(2) **Lodging of Documents.** In cases in which an execution date has been set, counsel shall lodge with the clerk of the Court of Appeals all district court documents as they are filed and any pertinent state court materials. If an execution date is imminent, counsel may also lodge proposed appellate papers in anticipation of having to seek emergency appellate relief.*

*(3) **Motion for Stay of Execution.** Any motion for stay of execution shall be considered initially in conjunction with any pending application for a certificate of appealability. Should a party file a motion to stay execution or a motion to vacate an order granting a stay of execution, the following documents shall accompany such motion:*

*(a) The habeas petition or motion to vacate filed in the district court;*

*(b) Each brief or memorandum of authorities filed by either party in the district court;*

*(c) Any available transcript of proceedings before the district court;*

*(d) The memorandum opinion giving the reasons advanced by the district court for denying relief;*

*(e) The district court judgment denying relief;*

*(f) The application to the district court for stay;*

*(g) Any certificate of appealability or order denying a certificate of appealability;*

*(h) The district court order granting or denying a stay and a statement of reasons for its action; and*
*(i) A copy of the docket entries of the district court.*

### Local Rule 22(c). Petitions for Rehearing in Death Penalty Cases.

*Once the Court's mandate has issued in a death penalty case, any petition for panel or en banc rehearing should be accompanied by a motion to recall the mandate and motion to stay the execution.*

*Generally, the Court will not enter a stay of execution solely to allow for additional time for counsel to prepare, or for the Court to consider, a petition for rehearing. Consequently, counsel should take all possible steps to assure that any such petition is filed sufficiently in advance of the scheduled execution date to allow it to be considered by the Court. Counsel should notify the Clerk's Office promptly of their intention to file a petition for rehearing so that arrangements can be made in advance for the most expeditious consideration of the matter by the Court.*

### Local Rule 22(d). Motions for Authorization.

*Any individual seeking to file in the district court a second or successive application for relief pursuant to 28 U.S.C. § 2254 or § 2255 shall first file a motion with the Court of Appeals for authorization as required by 28 U.S.C. § 2244, on the form provided by the clerk for such motions. The motion shall be entitled "In re _____, Movant." The motion must be accompanied by copies of the § 2254 or § 2255 application which movant seeks authorization to file in the district court, as well as all prior § 2254 or § 2255 applications challenging the same conviction and sentence, all court opinions and orders disposing of those applications, and all magistrate judge's reports and recommendations issued on those applications. The movant shall serve a copy of the motion with attachments on the respondent named in the proposed application and shall file an original and three copies of the motion with attachments in the Court of Appeals. Failure to provide the requisite information and attachments may result in denial of the motion for authorization.*

*If the Court requires a response to the motion, it will direct that the response be received by the clerk for filing within no more than seven calendar days. The Court will enter an order granting or denying authorization within 30 days of receipt of the motion by the clerk for filing, and the clerk will certify a copy of the order to the district court. If authorization is granted, a copy of the application will be attached to the certified order for filing in the district court. No motion or request for reconsideration, petition for rehearing, or any other paper seeking review of the granting or denial of authorization will be allowed.*

*I.O.P.-22.1. Death Penalty Cases. Once a notice of appeal has been filed in a case involving a sentence of death where an execution date has been set, a panel of three judges will be promptly identified for consideration of all matters related to the case. The position of coordinator of case information in death penalty cases has been established in the Clerk's Office of the Court of Appeals for the purpose of establishing personal liaison with district court personnel and counsel to aid in the expeditious treatment of appeals involving a sentence of death. An expedited briefing schedule will be established when necessary to allow the Court the opportunity to review all issues presented.*

*Local Rule 22(a) amended December 1, 1995, June 5, 1996, December 1, 1998, and July 8, 2003.*
*Local Rule 22(b) amended December 1, 1995 and June 5, 1996.*
*Former I.O.P.-22.3 redesignated Local Rule 22(c) December 1, 1995; Local Rule 22(c) amended December 1, 1998 and December 1, 2002.*
*Local Rule 22(d) added June 5, 1996, and amended December 1, 2002.*
*Former I.O.P.-22.1 deleted December 1, 1995.*
*Former I.O.P.-22.2 redesignated I.O.P.-22.1 December 1, 1995, and amended June 1, 1999.*