PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

GEORGE CALE BUCKNER,
　　　　　*Petitioner-Appellant,*

v.

MARVIN POLK, Warden, Central
Prison, Raleigh, North Carolina,
　　　　　*Respondent-Appellee.*

No. 05-14

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Richard L. Voorhees, District Judge.
(CA-03-28-3-V)

Argued: January 31, 2006

Decided: June 26, 2006

Before GREGORY, SHEDD, and DUNCAN, Circuit Judges.

Affirmed by published opinion. Judge Duncan wrote the majority opinion, in which Judge Shedd joined. Judge Gregory wrote a separate opinion concurring in part and dissenting in part.

## COUNSEL

**ARGUED:** E. Fitzgerald Parnell, III, POYNER & SPRUILL, L.L.P., Charlotte, North Carolina, for Appellant. Steven Franklin Bryant, Assistant Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Joseph E. Zeszotarski, Jr., POYNER & SPRUILL, L.L.P., Raleigh,

North Carolina, for Appellant. Roy Cooper, Attorney General of North Carolina, Raleigh, North Carolina, for Appellee.

---

**OPINION**

DUNCAN, Circuit Judge:

George "Cale" Buckner petitions this court for review of the district court's denial of his petition under 28 U.S.C. § 2254 for relief from his North Carolina first-degree murder conviction and death sentence. For the reasons that follow, we affirm.

I.

On February 19, 1992, in Gaston County, North Carolina, Buckner's friends Dennis Eason and Anthony Cathcart drove Buckner and another friend, Jamie Bivens, to the home of Eddie Dow and left them there to wait for Dow. Dow was subsequently robbed and murdered in front of his home, killed by three shots fired from an SKS rifle belonging to Buckner's brother.

A few days after the murder, Buckner came to the police station for questioning at the request of police. The officers left him alone in an unlocked office for several hours, during which time he fell asleep. Officers eventually returned to question Buckner, telling him that Bivens had identified Buckner as Dow's killer. Buckner responded that he had not killed anyone and requested to speak with his lawyer before making a statement. The police ceased their questions, arrested him, did not read him his *Miranda* rights, and did not contact the lawyer whom Buckner had requested.

Buckner was charged with, among other crimes, first-degree murder. At his trial, Buckner testified that Bivens had murdered Dow and that he had been present only to gather, in his capacity as a police informant, information about Dow's drug activities. By contrast, Bivens, Eason, and Cathcart testified that Buckner had been the shooter. In its closing argument, the state challenged Buckner's version of the events by alluding to his failure to name Bivens as the

killer immediately after the crime, during his brief questioning at the police station, or during his pre-trial incarceration when he was writing to law enforcement authorities across North Carolina to offer information about other defendants and crimes about which he had knowledge.[1] The jury convicted Buckner of first-degree murder under

---

[1]In reference to Buckner's silence immediately after the crime and after police questioning about the murder, the prosecutor asked the jury:

> Why doesn't he tell the police? Why doesn't Mr. Buckner say anything to the police? He doesn't give a statement. When the police come to him and say, you know, "Jamie's over there, says you're the trigger man," he says, "I didn't shoot anybody; I don't know anything." Put yourself in that position. You didn't do a murder and someone accuses you. What's the first words out of your mouth if you know who the murderer was? The person's name. Why is Mr. Buckner not saying, "Jamie Bivens did the shooting"? Because Jamie Bivens didn't do the shooting.

(J.A. at 342.) The prosecutor continued, saying "[the police] tried to talk to Mr. Buckner, but he didn't want to talk to them." (J.A. at 348.)

In reference to Buckner's silence when he was at the police station awaiting questioning, the prosecutor told the jury:

> That Sunday, when Jamie Bivens tells what Mr. Buckner did, when Jamie Bivens goes out to the scene and starts showing them where evidence was at, Cale Buckner could've done the same thing. Cale Buckner could've made a statement saying Jamie Bivens was the person who did the shooting. Cale Buckner could've volunteered to go out and show where evidence was. He didn't; he didn't. And how do you know he's the trigger man, Ladies and Gentlemen? Think about this; think about this. Put yourself in the role of Mr. Bivens or Mr. Buckner. You were out there, whether you did the shooting or you participated. The police are waiting for you when you arrive back at the house; they said they want to talk to you about Eddie Dow's death. And you go to the county police department and what's going to be your reaction? Your heart's going to be racing because you knew . . . you were out there at the scene. You're going to be nervous about what's going to happen, especially if you're the one who's just along for the ride. But what does Mr. Buckner do? Does he show his concern? He falls asleep. Mr. Cool, Mr. Confident, Mr. Big-Time Police Informant, doesn't have a thing to worry about.

alternate theories of felony murder, lying in wait, and premeditation and deliberation. The trial court imposed the jury's recommended sentence of death.

After exhausting his direct appeal, Buckner began his state collateral post-conviction appeals, which in North Carolina are brought via a Motion for Appropriate Relief ("MAR") in the Superior Court ("MAR court"). The MAR court denied relief and the North Carolina Supreme Court affirmed that decision. Buckner then turned to the federal courts, filing a § 2254 petition for habeas relief based on several alleged points of error concerning his conviction and sentence. The district court denied the petition in its entirety but granted a certificate of appealability on Buckner's Fifth Amendment claim concerning the state's reference during its closing argument to Buckner's post-arrest, pre-*Miranda* silence. This court expanded the certificate to include two additional claims: 1) actual innocence based on new evidence purporting to show that Bivens, not Buckner, was the shooter, and 2) ineffective assistance of counsel at sentencing.[2]

---

> He thinks he's got it all wrapped up, so he goes to sleep. The person who didn't do the killing is going to be real nervous; he ain't going to be falling asleep. The person who didn't do the killing or . . . wasn't the trigger man is going to want his message told to the police. Mr. Buckner didn't tell them.

(J.A. at 343-45.)

In reference to evidence that while he was awaiting trial Buckner wrote to the police about other crimes, the prosecutor told the jury:

> [H]e writes all those authorities, Dare County, Alleghany County, Nash County, Forsyth, Pitt, you know, where — never wrote Gaston County to say Jamie Bivens really did the shooting. He's got all that time to write all these other counties and he never writes and says Jamie Bivens did the shooting, because Jamie Bivens didn't do the shooting.

(J.A. at 341.)

[2]After Buckner's attorneys filed his petition to expand the certificate of appealability, Buckner wrote this court to request that we also consider his claim that his state court conviction violated the Fifth Amendment grand jury clause because his indictment listed the elements of second-degree murder, but he was convicted of first-degree murder. We declined to grant a certificate of appealability as to that issue.

## II.

This court reviews de novo the district court's denial of Buckner's petition for a writ of habeas corpus. *See Conner v. Polk*, 407 F.3d 198, 204 (4th Cir. 2005), *cert. denied*, 164 L. Ed. 2d 135 (2006). The Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254 (2000), governs this court's consideration of Buckner's challenges to his state conviction and sentence, each of which has already been adjudicated on the merits in state court.

Under the AEDPA's deferential standard of review, a state court's adjudication of questions of law warrants issuance of the writ only if such adjudication was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or if it was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(1)-(2). A decision is "contrary to" clearly established federal law if it either applies a legal rule that contradicts prior Supreme Court holdings or reaches a conclusion different from that of the Supreme Court "on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A decision is an "unreasonable application" of clearly established federal law if it "unreasonably applies" a Supreme Court precedent to the facts of the petitioner's claim. *Id.* at 413.

In deciding whether a petitioner has demonstrated the deficiency of the state court adjudication under § 2254(d), federal courts must presume state court findings of fact to be correct unless the petitioner rebuts that presumption by clear and convincing evidence. § 2254(e)(1).

## III.

Buckner first requests habeas relief based upon new evidence that he claims proves his actual innocence of masterminding the robbery and shooting Dow. The MAR court summarily denied this claim on state law grounds without consideration of its possible federal constitutional dimensions. The district court denied the claim, concluding that it was not cognizable on federal habeas review. We also deny relief.

A.

At the MAR hearing, Buckner offered affidavits and testimony from jailhouse informants who claimed that Bivens, Eason, and Cathcart all named Bivens as the person who had planned the robbery and shot Dow. Buckner also offered the testimony of an eyewitness who claimed that, when she saw Bivens a few hours after the robbery and murder, Bivens looked agitated and declared that he had "got [him] a piece" of Dow. (J.A. at 86.) He claims that this new evidence demonstrates his actual innocence of facts necessary to sustain his conviction and sentence.

Habeas petitioners may use an actual innocence claim to excuse the procedural default of a separate constitutional claim upon which they request habeas relief. *Murray v. Carrier*, 477 U.S. 478, 496 (1986) ("[When] a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."); *see also Reid v. True*, 349 F.3d 788, 806 (4th Cir. 2003). These so-called "gateway" innocence claims may be based upon evidence of the petitioner's innocence of the crime for which he was convicted, *see, e.g.*, *Schlup v. Delo*, 513 U.S. 298, 326-27 (1995), or of the sentencing factors that rendered him eligible for the death penalty, *see, e.g.*, *Sawyer v. Whitley*, 505 U.S. 333, 350 (1992).

However, as the district court recognized, the Supreme Court has strongly suggested that claims of actual innocence standing alone do not serve as an independent basis for habeas relief: "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). Citing *Herrera*, in *Rouse v. Lee*, 339 F.3d 238, 255 (4th Cir. 2003), this court noted that "claims of actual innocence are not grounds for habeas relief even in a capital case."

While acknowledging authority to the contrary, Buckner nevertheless contends that the point is subject to debate. According to Buckner, *Herrera* does not completely foreclose free-standing claims of actual innocence. We need not address the issue here, however. As

the Supreme Court has suggested, and Buckner recognizes, if free-standing actual innocence claims were cognizable on federal habeas review, "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Herrera*, 506 U.S. at 417. On the facts before us, Buckner has failed to meet even the presumptively less stringent standard of proof by which gateway innocence claims are measured.

B.

Buckner's new evidence does not establish his actual innocence of first-degree murder. Petitioners who wish to use a claim of actual innocence as a gateway to raising an otherwise defaulted constitutional claim must demonstrate by a preponderance of the evidence that a reasonable juror could not have convicted the petitioner in light of the new evidence. *See Schlup*, 513 U.S. at 327. The jury found Buckner guilty of first-degree murder under three separate theories, including felony murder.[3] As the district court recognized, Buckner's "evidence speaks only to whether he or Bivens pulled the trigger; it has no bearing upon the evidence presented at trial that [he] was an active and willing participant in the robbery of Eddie Dow." (J.A. at 749.) New evidence that merely undermines the state's theory of the case but does not rebut specific jury findings of guilt is insufficient to demonstrate actual innocence. *See Herrera*, 506 U.S. at 418-19. Because Buckner was convicted under a theory of felony murder and has provided no evidence contradicting his guilt of Dow's robbery or the connection between that robbery and Dow's death, he has not stated a viable free-standing claim of actual innocence of first-degree murder.

C.

Similarly, Buckner's new evidence does not demonstrate his innocence of capital felony murder. Felony murder is a capital crime only

---

[3]North Carolina law defines the felony murder theory by reference to the defendant's participation in a predicate felony. *See* N.C. Gen. Stat. § 14-17 (2005) ("A murder . . . which shall be committed in the perpetration or attempted perpetration of any . . . robbery . . . [is] murder in the first degree . . . .").

if the defendant killed, intended to kill, intended that a killing take place or that lethal force be employed, or participated so significantly in the underlying felony that he exhibited reckless indifference to human life. *Enmund v. Florida*, 458 U.S. 782, 797 (1982); *Tison v. Arizona*, 481 U.S. 137, 158 (1987). The jury's sentencing recommendation of death in this case was predicated upon its threshold finding that one or more of these capital felony murder factors applied to Buckner. In the context of capital sentencing, a viable gateway innocence claim demonstrates by clear and convincing evidence that, but for the defaulted constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty. *See Sawyer*, 505 U.S. at 350. In other words, the new evidence must establish by clear and convincing evidence Buckner's innocence of any sentencing factor that made him eligible for capital punishment.[4]

Buckner's new evidence, if credible, might demonstrate his innocence of killing, intending to kill, intending that a killing take place, or intending that lethal force be employed. However, even assuming that the new evidence conclusively shows that Bivens planned the robbery and shot Dow, it does not show that no reasonable juror could have found that Buckner's participation in the robbery rose to the level of reckless indifference to human life. The jury heard evidence, none of which the new evidence contradicts, that Buckner was aware of Bivens' plan to rob Dow, that he was present at the robbery and murder, that he participated in the robbery, that he helped to conceal the crime by disposing of evidence, and that, despite having time and

---

[4]Though Buckner's new evidence of actual innocence might also have affected the jury's determination that the mitigating evidence did not outweigh the aggravating factors, the addition of more persuasive mitigation evidence would not have made Buckner constitutionally ineligible for the death penalty. Albeit in the context of a gateway innocence claim, the Supreme Court has rejected an invitation to expand the actual innocence standard to include demonstrations that new mitigating evidence makes it unlikely that the jury would have opted for death. *See Sawyer*, 505 U.S. at 343-47. Given the Court's indication that free-standing actual innocence claims, if cognizable at all on federal habeas review, would be subject to even higher standards of proof than their gateway counterparts, *see Herrera*, 506 U.S. at 417, we cannot conclude that the new evidence's speculative effect on the jury's sentencing recommendation provides a basis for habeas relief.

opportunity to do so, he did not report the crime to the police. This evidence is sufficient to support a jury finding that Buckner's participation in Dow's robbery constituted reckless indifference to human life. *See, e.g.*, *Tison*, 481 U.S. at 151-52; 157-58 (defendants who knew beforehand that their accomplices were likely to commit murder, who robbed the victims at their accomplices' direction, and who stood by while the murders were committed were guilty of capital felony murder). We therefore find Buckner's new evidence insufficient to demonstrate his actual innocence of capital felony murder.

## IV.

Buckner next requests habeas relief based on his argument that he received ineffective assistance of counsel during the sentencing phase of his trial. The MAR court denied this claim after a hearing. The district court also denied relief, as do we.

## A.

Buckner claims that his counsel failed to investigate, discover, develop, and present mitigating evidence that might have convinced the jury not to recommend a death sentence. To demonstrate that he received ineffective assistance of counsel at his sentencing, Buckner must show that (1) his attorney's performance "fell below an objective standard of reasonableness" and (2) a reasonable probability exists that, but for the deficient performance, he would not have been sentenced to death. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). Even assuming, without deciding, that the performance of Buckner's trial counsel was unreasonable, we agree with the MAR court that Buckner has not demonstrated the requisite prejudice.

## B.

Under the first prong of *Strickland*, Buckner must show that his counsel's performance at sentencing "fell below an objective standard of reasonableness" based on the situation at the time rather than on hindsight. *Strickland*, 466 U.S. at 688-90. Counsel's conduct is generally presumed to be a reasonable strategic choice, but is not reasonable to the extent that the choice of strategy does not rely upon either

a full investigation of the law and facts or an abbreviated investigation of the law and facts limited only by "reasonable professional judgments." *Id.* at 690-91.

Buckner claims that his lead counsel for the sentencing phase of the trial, David Childers, spent an unreasonably short amount of time preparing for sentencing and consequently failed to uncover and present to the jury mitigating factors concerning his background and mental health. At the MAR hearing, Childers testified that he conducted "the bulk" of his work for the sentencing phase beginning approximately one and one-half months before trial. (J.A. at 135.) He also explained that he had initially focused his efforts on developing evidence that Buckner was not the shooter and that he turned his attention to preparing mitigation evidence during the guilt phase of the trial, only one week before the sentencing phase began. Finally, during this time Childers was also solely responsible for responding to an IRS deficiency investigation that had the potential to put his law partnership out of business and "take everything [he] had." (J.A. at 129.) Childers was consumed by his efforts to secure a loan to pay the partnership's sizeable tax bill, to meet with the IRS investigators, and to juggle the partnership's other unpaid bills.

Accepting Childers' statement that the bulk of the work in preparation for mitigation occurred during the week that he was also participating in the guilt phase of the trial and handling his partnership's IRS difficulties, his efforts were certainly less than optimal. Strategies based upon counsel's unreasonably short preparation time rather than upon reasoned professional judgment can, in some circumstances, constitute deficient performance of counsel under the *Strickland* standard. *See Wiggins v. Smith*, 539 U.S. 510, 526 (2003) (finding ineffective assistance of counsel in part because inattention rather than professional judgment guided counsel's conduct).[5] Because we hold that Buckner was not prejudiced by Childers' lack of preparation,

---

[5]We nevertheless recognize the constraints under which Childers was compelled to function. The record shows that he attempted to withdraw as Buckner's counsel when it became clear that his partnership's financial difficulties would unacceptably interfere with his representation, but the state trial court denied his motion.

however, we need not decide whether his performance was constitutionally deficient.[6]

---

[6]Our conclusion with respect to the prejudice prong of the *Strickland* standard obviates the need to decide the reasonableness prong. In light of our respected colleague's expansive dissent, however, we feel compelled to point to other evidence of record, considered by the MAR court, that more fully reflects counsel's efforts.

First, the MAR court heard evidence that, while Buckner's counsel did most of his mitigation work during the final week of the guilty phase of the trial, he did begin his mitigation efforts, at least generally, in the late spring or summer of 1992, approximately fifteen months before Buckner's trial began in September of 1993.

Moreover, while Childers certainly could have done more, the dissent's assertion that his conduct "fell far below an objective standard of reasonableness," *infra* p. 36, is hard to reconcile with the MAR court's extensive findings of fact, which we must presume to be correct unless rebutted by clear and convincing evidence. *See* § 2254(e)(1). The MAR court found that, during Childers' mitigation preparation, he met with individuals at the North Carolina Center for Death Penalty Litigation and hired a psychologist to interview Buckner. That psychologist failed to obtain any information because of Buckner's repeated refusals to cooperate and insistence that he had no mental or emotional problems and that no events in his childhood had adversely affected him. Buckner's other attorney, a Mr. Bell, had a lengthy relationship with Buckner and did not see any evidence of mental or medical problems. The MAR court also heard evidence that, despite those rebuffs, Childers made further efforts to obtain a psychological evaluation and that he ultimately succeeded in obtaining a pretrial evaluation. At counsel's request, the trial court also appointed an investigator to assist in obtaining interviews to develop mitigation evidence. After a full review of the facts, including those specifically found by the MAR court, we question the dissent's assertion that clearly established Supreme Court precedent requires more.

Further, as the MAR court found, Childers did not present psychological mitigating evidence for a variety of reasons, some of them strategic. Defense counsel developed evidence from the defendant and his own family that he was raised by caring parents and was neither mentally nor emotionally abused. Finally, and perhaps most significantly, the MAR court concluded that presenting evidence of Buckner's mental problems would have run counter to the defense theory during the guilt phase that he had been "an extremely competent informant who survived in a highly dangerous world of 'police informants.'" (J.A. at 453.) *Strickland* clearly

## C.

The second prong of the *Strickland* standard compels Buckner to demonstrate a "reasonable probability," or by somewhat less than a preponderance of the evidence, that, but for the alleged constitutional deficiency in Childers' representation, he would not have been sentenced to death. *Strickland*, 466 U.S. at 694. A reasonable probability that, despite Buckner's legal eligibility for the death penalty, one juror considering the original and newly raised evidence together would have voted for life imprisonment satisfies this standard. *See Wiggins*, 539 U.S. at 536-37. To recommend death over life imprisonment, North Carolina juries must unanimously find that mitigating factors do not outweigh aggravating factors.[7] N.C. Gen. Stat. § 15A-2000(c) (2005). Buckner therefore must demonstrate a reasonable probability that at least one juror would have found that his new mitigating evidence, combined with the existing mitigating evidence, outweighed the aggravating circumstances surrounding Dow's death.

Even if on de novo review we might strike a different balance concerning the relative weight of the aggravating and mitigating evidence, we may not disturb the MAR court's conclusion that Buckner did not demonstrate prejudice unless we find that conclusion to be unreasonable in light of clearly established Supreme Court precedent or in light of the evidence before the MAR court. *See* § 2254(d)(1)-(2). When determining whether Buckner has satisfied one of these two standards, we must presume the MAR court's factual findings to be correct unless Buckner provides clear and convincing evidence to the contrary. *See* § 2254(e)(1).

---

instructs us as to the inappropriateness of second-guessing decisions regarding trial strategy. 466 U.S. at 690 ("[Courts] should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasoned professional judgment. . . . [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . .").

[7]Though not directly relevant to our analysis of Buckner's burden of proof, capital juries in North Carolina must also unanimously find that the aggravating factors are "sufficiently substantial" to warrant a sentence of death. N.C. Gen. Stat. § 15A-2000(c) (2005).

At the MAR proceedings and before the district court, Buckner argued that Childers' mitigation presentation had prejudiced him because it did not include a fuller treatment of the difficult circumstances of his childhood and how those circumstances had helped to shape his emotional immaturity. He supported this claim with affidavits from Cynthia Maxwell, a mitigation specialist; Nathan Strahl, a psychiatrist; and Claudia Coleman, a psychologist. According to Buckner, these affidavits detailed the mitigation evidence that Childers could have discovered had he devoted a reasonable amount of time to preparation and made reasonable decisions in response to the information that he did uncover. In short, Buckner claimed that these affidavits established a reasonable probability that he would have received a life sentence absent Childers' errors.

The MAR court determined that the Maxwell, Strahl, and Coleman affidavits were "not credible" because Buckner and his family were "now motivated to take a different tact [sic] by an imposed sentence of death." (J.A. at 453.) The dissent posits that the MAR court mistakenly discounted the affidavits' credibility, arguing that counsel's failure to impress upon Buckner and his family the importance of cooperating with the mitigation investigation, not their belief in the truth of their original statements, was responsible for the delay in uncovering the new information. He concludes that the MAR court rejected the affidavits "simply because they relied on information obtained from Buckner and his family following his conviction." *Infra* p. 44.

This conclusion has no apparent basis in the record. The MAR court did not reject the Maxwell, Strahl, and Coleman affidavits because the information upon which they were based was gathered after his conviction, but because the same people who provided that new information had provided *directly contradictory* stories to counsel prior to and at trial. The MAR court found that Buckner had told his counsel that he had no mental or emotional problems, that Buckner repeatedly refused to cooperate with evaluating psychologists, and that he "was adamant . . . that the tragedies in his life did not affect him mentally or emotionally." (J.A. at 453.) It further concluded that counsel's background investigation uncovered evidence that Buckner was not abused as a child and that he "was raised by loving parents." *Id.* In addition, the MAR court found that one of Buckner's attorneys,

"who had a long-standing relationship with [Buckner], did not see any evidence of medical or mental problems." (J.A. at 453.) Finally, Buckner's mother testified at sentencing that Buckner had a good childhood relationship with his father and that nothing marked Buckner's childhood as particularly difficult. Buckner has made little attempt to explain why his and his family's stories have changed or why the newly minted versions of Buckner's childhood and mental health are more reliable than the originals. Indeed, he has argued only that he and his family did not fully understand the gravity of the situation prior to trial. This lone argument, coupled with the absence of any explanation for the contradictory stories, suggests that the MAR court's credibility finding was in fact correct. Even drawing only favorable inferences from his argument, we cannot say that these inferences rebut the state court's credibility finding by clear and convincing evidence.[8]

Further, even if we could surmount the barrier of the MAR court's adverse credibility finding to consider the new information in the affidavits, we think that neither *Strickland* nor its Supreme Court progeny contravene the MAR court's conclusion that Buckner suffered no constitutionally cognizable prejudice from Childers' representation. Indeed, an examination of the proffered evidence suggests that it differs primarily in degree rather than in kind from the evidence that Childers presented.

The Maxwell affidavit recounts several aspects of Buckner's childhood and young adulthood that Childers did not raise or raised in less detail during sentencing. For example, it describes general neglect and emotional abuse by both parents, Buckner's father's physical abuse of his mother when Buckner was a child, his mother's alcoholism during his childhood, his mother's rumored sexual relationship with a female friend who lived with the family during his adoles-

---

[8]The dissent asserts that Buckner and his family's contradictory statements do not necessarily undermine the credibility of the affidavits because neither Buckner nor any member of his family is a mental health expert, but fails to recognize that, under AEDPA, our task is not to decide the credibility issue de novo but to determine whether Buckner has produced clear and convincing evidence that the MAR court's resolution of that issue was incorrect.

cence, his lack of regular medical and dental care as a child, the death of his father in 1991, and his mother's diagnosis of ovarian cancer. Maxwell also recounted in detail the story of the death of Buckner's brother in the house fire, the injury of his father in the fire, and the father's inability to save the younger brother. As a result of witnessing these events, according to Maxwell, Buckner developed nightmares and a sleepwalking disorder for which he received no mental health care or counseling.

The Strahl affidavit opined that at the time of Dow's murder Buckner had the emotional maturity of a twelve-year-old. Strahl also asserted that Buckner lacked mature reasoning and decision-making skills, that he harbored a need for acceptance and was easily influenced by others, and that these emotional deficiencies "contributed materially" to Buckner's involvement in Dow's death. (J.A. at 293.) Strahl concluded that, with treatment, Buckner could ameliorate these problems and become a constructive individual. The Coleman affidavit contains findings similar to those in the Maxwell and Strahl affidavits.[9]

In determining that Childers' performance at sentencing did not prejudice Buckner, the MAR court pointed to the existing mitigation evidence touching on various aspects of Buckner's life, from his family history to his activities as a police informant. Childers portrayed Buckner as the product of a troubled home, whose father had a history of alcohol abuse and whose brother died in a house fire when Buckner was young. He presented evidence of Buckner's personality and values, including testimony describing him as a person who "[gets] along well with others," who "especially [likes] children," and who was a hard-working employee. Childers also detailed Buckner's assistance in the prosecution of several people for criminal offenses, including murder. By contrast, the MAR court found that the state had presented "overwhelming evidence" in support of a sentence of death.[10] (J.A. at 454.)

---

[9]Large portions of the Coleman and Maxwell affidavits share identical language. It is clear that one of the affiants borrowed heavily from the statements of the other, a fact that lends weight to the MAR court's finding that the purportedly independent professional opinions expressed in these affidavits were not credible.

[10]In hypothesizing about the existence of prejudice, the dissent asserts that "this was not an open-and-shut case of overwhelming guilt," *infra*

Although Buckner and the dissent disagree with the MAR court's conclusion that Buckner suffered no prejudice, neither has shown that this conclusion was unreasonable in light of clearly established Supreme Court precedent. A review of the decisions in which prejudice has been found presents a stark contrast with the type of evidence presented by Buckner. In *Williams*, for example, the Supreme Court found prejudice from counsel's failure to present at sentencing any evidence of the defendant's "nightmarish childhood," which included a home littered with urine, feces, and trash; lack of basic hygienic care from his parents; the imprisonment of both alcoholic parents for criminal neglect of the defendant and his siblings; severe and repeated physical abuse of the defendant by the defendant's father; and two years in the custody of social services during which he spent time in an abusive foster home. 529 U.S. at 395 & n.19. Though the prosecution had presented extensive evidence of the defendant's potential for future dangerousness, including expert testimony and his criminal history of armed robbery, burglary, grand larceny, violent assaults on elderly victims, and arson, the Court found that this new evidence, in conjunction with the existing evidence detailing the defendant's actions alerting police to his crime and cooperating with the investigation, could have altered the jury's "appraisal of [the defendant's] moral culpability." *Id.* at 398.

The Court in *Wiggins* similarly found prejudice from counsel's failure to alert the jury to defendant's borderline mental retardation

---

p. 44, suggesting that the evidence in aggravation was so paltry that the MAR court was unreasonable to conclude that Buckner's new mitigating evidence did not satisfy *Strickland*. The dissent predicates this speculation upon the fact that at least one juror noted the involvement of two people in the murder as a mitigating factor.

In addition to ignoring the MAR court's assessment that the evidence in aggravation was "overwhelming," the dissent's argument founders completely upon the fact that the jury found Buckner guilty of first-degree murder under a theory of felony murder, which, as we have noted, is a capital offense under North Carolina law. § 14-17. The jury's finding that another person (presumably Bivens) in addition to Buckner had been involved in the murder does nothing to undermine the evidence of the circumstances surrounding Buckner's commission of felony murder.

and severe childhood physical and sexual abuse, which included neglect by his alcoholic mother, who would abandon him for days during which he would beg for food and eat paint chips and garbage; beatings for breaking into his mother's locked kitchen; hospitalization after his mother had forced his hand against a hot stove; physical abuse by two different foster mothers; repeated rapes and molestation by a foster father; multiple gang rapes by a third foster mother's sons; sexual abuse by a Job Corps supervisor; and homelessness during a period of his adolescence. 539 U.S. at 516-17, 534-35. Weighing this new evidence and the existing evidence of the defendant's lack of a criminal history against the details of the defendant's murder of an elderly woman, the Court found that the defendant was prejudiced by counsel's unreasonable performance. *Id.* at 534-38.

The Maxwell and Coleman affidavits discussing Buckner portray a childhood marked by dysfunctional relationships and sub-optimal care. Even taken as true, however, they do not describe the type of severe and prolonged child abuse and profound psychological disturbances that were present in *Wiggins* and *Williams*. Similarly, the Strahl and Coleman affidavits opine that Buckner had the emotional maturity of a twelve-year-old at the time of the crime and that this immaturity led him to make poor decisions that culminated in his participation in Dow's robbery and murder. This evidence nevertheless does not compare to the borderline mental retardation about which Wiggins' jury was not informed.

Furthermore, this circuit has upheld as not unreasonable state court applications of *Strickland* finding no prejudice from counsel's failure to introduce evidence adding negligible detail or credibility to mitigating factors that counsel had already presented to the jury. *McHone v. Polk*, 392 F.3d 691, 709-10 (4th Cir. 2004) (no prejudice from counsel's failure to present evidence that as a child petitioner had witnessed his father "regularly inflict brutal beatings" on his mother and half-sister when counsel had presented evidence that petitioner's father had engaged in "violent fights" with his mother); *Tucker v. Ozmint*, 350 F.3d 433, 442-43 (4th Cir. 2003) (no prejudice from counsel's failure to present evidence undermining prosecution's argument that defendant had fabricated his claims of childhood physical and sexual abuse because prosecution and defense witnesses uniformly agreed that petitioner had suffered such abuse).

On de novo review of a § 2254 claim, we reached a similar conclusion that counsel did not prejudice the petitioner by his failure to present additional evidence that was merely cumulative of the existing case in mitigation. *See Moody v. Polk*, 408 F.3d 141, 154 (4th Cir. 2005) (no prejudice from counsel's failure to present more evidence concerning petitioner's childhood abuse because one expert and two family members testified that the abuse claims were accurate and the prosecution presented no evidence contradicting that testimony), *cert. denied*, 126 S. Ct. 1060 (2006).

To the extent that the Maxwell and Coleman affidavits provide new detail of the stories of Buckner's brother's death and his father's alcoholism, we conclude that this new detail is largely cumulative. The affidavits contend that after the fire Buckner received no counseling and suffered from nightmares and sleepwalking for a period of time. They further assert that Buckner's alcoholic father emotionally neglected him and that his mother would sometimes take the children away from the house when his father was drinking. None of these details adds significant color to the inherently tragic circumstances of losing a sibling or living with an alcoholic parent. The MAR court found that Childers had presented both of those issues to the jury. We are thus unable to conclude that these additional details would have added measurably to Buckner's mitigation case.

Weighing the evidence of Buckner's history of criminal violence and of the circumstances surrounding Dow's murder against the existing mitigation evidence, Buckner's jury concluded that the mitigating circumstances did not outweigh the aggravating circumstances concerning the events of Dow's robbery and murder. Even assuming arguendo that the MAR court was wrong to discount Buckner's new evidence as unreliable, we cannot say that the MAR court contravened *Strickland* in concluding that Buckner had not shown a reasonable probability that a juror would have changed that calculation based on Buckner's new evidence. At best, that new evidence paints a picture of a non-organic emotional immaturity and rounds out the details of a personal history already presented to the jury.

V.

Finally, Buckner requests habeas relief based upon the state's closing arguments referencing his post-arrest silence, which he claims violated his Fifth Amendment right to be free from self-incrimination. On direct appeal, the North Carolina Supreme Court found that the state's references to Buckner's silence were for the permissible purpose of impeaching Buckner's trial testimony and denied the claim. *State v. Buckner*, 342 N.C. 198, 237-38 (1995). The district court denied the claim on the same grounds, as do we.[11]

Well-settled law prohibits states from using a defendant's post-*Miranda* silence to impeach that defendant's testimony providing an exculpatory version of the events in question. *See Doyle v. Ohio*, 426 U.S. 610, 619 (1976). However, states may use a defendant's pre-*Miranda* silence, whether it occurred before or after arrest, to do so. *See Fletcher v. Weir*, 455 U.S. 603, 607 (1982) (per curiam) (concerning post-arrest, pre-*Miranda* silence); *Jenkins v. Anderson*, 447 U.S. 231, 240-41 (1980) (Stevens, J., concurring) (concerning pre-arrest silence).

---

[11]The district court further concluded that, even if the prosecutor's references were construed to be part of the state's case-in-chief, Buckner's claim still lacked merit. It found that, because of the split of authority in the courts of appeals and the absence of clear Supreme Court authority, the MAR court's refusal to prohibit the use of a defendant's pre-*Miranda* silence in the state's case-in-chief was not an unreasonable application of Supreme Court precedent and therefore should not be disturbed on federal habeas review. However, the MAR court merely held the claim procedurally barred because the North Carolina Supreme Court had already adjudicated it on direct appeal. For its part, the North Carolina Supreme Court ruled only on the question of the use of a defendant's pre-*Miranda* silence for the purpose of impeachment; it did not rule on the alternative question concerning the use of a defendant's pre-*Miranda* silence in the state's case-in-chief. *See Buckner*, 342 N.C. at 222-24. Because we conclude that both the North Carolina Supreme Court and the district court correctly found the prosecutor's references to Buckner's silence to be in the nature of impeachment, we need not decide whether the state could have used that silence in its case-in-chief.

We agree with the MAR court and the district court that the prosecutor's references to Buckner's silence were for the permissible purpose of impeachment. Through his testimony Buckner attempted to exculpate himself by claiming that he had been present at Dow's robbery and murder as a police informant rather than as a participant. His pre-*Miranda* refusal to offer his version of the events to the police is probative of the truthfulness of that testimony. The fact that Buckner's testimony concerned his guilt does not insulate it from impeachment, even if in the state's case-in-chief the Fifth Amendment would bar the impeaching evidence or line of inquiry. *See, e.g.*, *Harris v. New York*, 401 U.S. 222, 225-26 (1971) (statements obtained in violation of *Miranda* may be used to impeach a defendant's testimony, even if that testimony bears "directly on the crimes charged" rather than on collateral matters).

Indeed, the Supreme Court's jurisprudence in this area has principally involved impeachment targeting the defendant's exculpatory testimony, rather than impeachment concerning more collateral matters. *Doyle* made clear that, while the state could not use the defendant's post-*Miranda* silence to impeach his exculpatory testimony, it nevertheless could use such evidence to impeach his testimony that he had not been silent at a particular time. 426 U.S. at 619 n.11. *Fletcher* and *Jenkins* later held that *Doyle*'s prohibition on the use of post-*Miranda* silence does not apply to pre-*Miranda* silence. 455 U.S. at 607; 447 U.S. at 241. Because the prosecutor's closing argument used Buckner's pre-*Miranda* silence to impeach his exculpatory testimony, we find that the prosecutor's remarks during closing arguments did not violate the Fifth Amendment.

## VI.

For the foregoing reasons, we affirm the district court's denial of Buckner's petition for relief from his North Carolina conviction and sentence. The judgment of the district court is

*AFFIRMED.*

GREGORY, Circuit Judge, concurring in part and dissenting in part:

No reasonable defense attorney in a death penalty case would fail to pursue mental health expert advice when faced with clear signs that

the defendant had suffered psychological trauma. The majority concludes, however, that an attorney's conduct in gathering some facts suggesting that the defendant suffered psychological trauma, without developing any expert evidence as to how these events *actually* affected the defendant, does not constitute ineffective assistance of counsel under the Sixth Amendment. Because the majority fails to appreciate the difference between lay testimony suggesting psychological trauma and expert testimony establishing actual trauma, as well as the significance juries have afforded the latter, I respectfully dissent from Part IV of the majority's opinion.

I.

The following is a recitation of the relevant facts underlying Buckner's ineffective assistance of counsel claim. After Buckner's indictment for the murder of Eddie Dow on March 3, 1992, the state trial court appointed Locke R. Bell and David C. Childers to represent Buckner. Bell assumed primary responsibility for the guilt/innocence phase of trial, while Childers assumed primary responsibility for the sentencing phase. Neither attorney had ever tried a capital murder case. The trial was scheduled to commence on September 7, 1993.

Over the course of the next year, counsel focused almost exclusively on preparing for the guilt/innocence phase of trial. In fact, during that period, the only step related to sentencing that counsel undertook was sending Buckner to Dorothea Dix Hospital for a pretrial mental evaluation in September 1992. Prior to the evaluation, Bell explained the purpose of the examination to Buckner, but did not warn him of the potential consequences of failing to cooperate. In addition, neither Bell nor Childers accompanied Buckner to the examination. Dr. Rollins, the forensic psychiatrist who examined Buckner, prepared the following outpatient summary:

> Mr. Buckner is a medium height, muscular man. Eye contact, attention, posture, and body movements were normal. He is overly respectful and gives the appearance of being cooperative, although he actually provided little information. No suicidal feelings, disorganized thinking, hallucinations, or delusions are noted. Perception, concentration, orientation, memory, intellectual functions are intact. Judg-

ment and insight appear average for his age and station. At this time, Mr. Buckner does not describe symptoms of a mental disorder. He is capable of proceeding to trial. He does not have a disorder that would relieve him of responsibility for his actions. Based on limited information provided by Mr. Buckner, no mitigating factors are identified.

J.A. 218-19.

By early spring of 1993, Childers became embroiled in an unrelated tax investigation. J.A. 129 ("I had IRS agents threatening to take everything I had. They wanted $100,000 and they wanted it right then, so I had to hustle."). Childers subsequently sought to withdraw himself from representing Buckner—a motion which the state trial court ultimately denied on July 16, 1993. While the motion was pending, Childers continued to participate in the case, although he felt "unable to effectively represent Mr. Buckner, despite [his] best efforts." J.A. 287.

With approximately six weeks remaining before trial, counsel finally began preparing for sentencing. Counsel interviewed Buckner's family, friends, and various law enforcement officials with whom Buckner had worked as a confidential informant. During trial preparations, both Bell and Childers became aware of two circumstances in Buckner's childhood. Specifically, they learned that a fire had killed Buckner's younger brother Bobby, and that Buckner's father suffered from severe alcoholism. J.A. 136, 243.

At some point, counsel consulted with the Death Penalty Resource Center to obtain general impressions of their case. Upon the Death Penalty Resource Center's recommendation, Childers retained a psychologist, Dr. Faye Sultan, to examine Buckner. However, Childers never advised Buckner to cooperate with Dr. Sultan. As a result, Dr. Sultan could not develop a professional opinion because Buckner refused to cooperate during the examination. According to Dr. Sultan, Buckner repeatedly stated, "[t]his is a waste of time because [Bell] and [Childers] are going to get me off and I don't need to be fooling with this." J.A. 217 (internal quotation marks omitted). Feeling discouraged, Childers simply abandoned his investigation into psycho-

logical issues.[1] J.A. 175 ("I just moved on from that point on. . . . I think my attitude was, you know, we've got to—we've got to get this man found not guilty or else we're going to have a rough time.").

Without an evaluation from Dr. Sultan, counsel's sole piece of psychological evidence was the pretrial mental evaluation prepared by Dr. Rollins. Counsel recognized that Dr. Rollins's evaluation was incomplete because it failed to mention the fire that had killed Buckner's younger brother or his father's alcoholism. Nevertheless, counsel did not follow up with Dr. Rollins, Dr. Sultan, or any other psychiatric expert to address these deficiencies. To the contrary, counsel decided to forego psychological evidence altogether based on Buckner's insistence that he did not need a psychological evaluation, and Bell's perception that Buckner appeared competent and well-adjusted. Counsel therefore proceeded to trial without any expert testimony regarding the psychological impact of the fire or Buckner's father's alcoholism.

During the guilt/innocence phase of trial, counsel attempted to show that Buckner was acting undercover as a confidential informant investigating Dow and that Jamie Bivens was the person who actually shot Dow. The jury ultimately rejected that theory and convicted Buckner of the murder. As the matter proceeded to the sentencing phase, counsel felt completely unprepared because they had focused almost exclusively on the guilt/innocence phase. In the week before the sentencing hearing, Childers felt forced to apply what he later called a "cotton candy approach" to various aspects of Buckner's life and drafted mitigation factors mostly related to Buckner's status as an informant. J.A. 173. Based on his limited preparations for sentencing, Childers resolved to "show that [Buckner] was a somewhat average student, a hard worker, and somebody who became a snitch for the police when he was arrested" through the testimony of his family

---

[1]In late August, Childers attempted one last-ditch effort to acquire a psychological evaluation from Dr. Sultan. However, Dr. Sultan sent an unidentified person (whose credentials are unknown) to evaluate Buckner. Buckner again did not cooperate. Childers then engaged an investigator, who had no professional background in psychology, to interview people acquainted with Buckner. This investigation was also fruitless.

members, high school officials, youth minister, and various police officers whom he had assisted as an informant. J.A. 171-72.

Some of the details related to the fire and Buckner's father's alcoholism trickled into the sentencing hearing. Buckner's mother testified that she was at work when the fire started at approximately 1:15 a.m. Sentencing Hr'g Tr. 59, October 4, 1993. According to Buckner's mother, Buckner and his twin brother, Carl, who were then six years old, had woken up because the closet in their bedroom had caught fire. After waking their father, they realized they were trapped in the house. Tragically, Buckner's younger brother Bobby, who was then four years old, died in the fire. *Id.* at 17 ("Carl and Cale got [Bobby] to the living room, and his dog was in the bedroom, and he run [sic] back to the bedroom, and him [sic] and his dog died together."). In attempting to save Bobby from the fire, Buckner's father suffered burns over eighty percent of his body.

Amber Phillips, Buckner's cousin, testified that when she arrived at the house nearly thirty or forty-five minutes later, the fire was still "blazing." *Id.* at 148. She took Buckner and his twin brother to live with her, while their father recuperated in the hospital for three or four months. *Id.* at 149. Phillips subsequently enrolled Buckner in a new school near her home, where he performed "remarkably well" but appeared to be "very nervous." *Id.* at 151. She observed that Buckner suffered from persistent stomach problems, took frequent bathroom trips, and could not eat.

Phillips further testified that during Buckner's early childhood, Buckner's father had serious alcohol abuse issues, which frequently rendered him emotionally unavailable. *Id.* at 145 ("[M]y uncle was an alcoholic and therefore, was—physically was there; but emotionally, maybe he was not there so much. . . . He went to, you know, different facilities to help you stop; and he just never could; and that was—that took a very predominant part of his life . . . ."). According to Phillips, Buckner's father began drinking as soon as he came home from his day shift and frequently passed out early in the evening. Although Buckner's father had been muscular and strong, the house fire "burned down his spine and his feet and his head and his arms" and destroyed most of his flesh. *Id.* at 150. Phillips recalled that Buckner's

father appeared physically smaller, emotionally depressed, and "very much absorbed in having lost a child." *Id.* at 156.

During closing argument at the sentencing hearing, the prosecution aptly asserted that counsel never established any negative effects arising from Buckner's father's alcoholism. Sentencing Hr'g Tr. 377, October 6, 1993 ("He's not had it that bad. Nothing about his father being an abusive alcoholic father. Actually, there's the exact opposite."). Moreover, the prosecution pointed out that counsel had failed to identify the fire as a mitigating factor in the Issues and Recommendation form, and further suggested that the jury should not consider it as a mitigating factor:

> You're six years old, and your four-year old brother burns up in front of you. That's tragic. There is no way that the State will deny that has to be about as tragic experience as one can go through, and there's not an attempt to. What you have to consider is how does that lead to him standing outside Eddie Dow's house. *You didn't hear anything that would lead you to the conclusion it did. You have not heard anything that shows that affected George Cale Buckner.*

*Id.* at 382 (emphasis added); *id.* at 382-83 ("The simple fact is that they've not offered you any effect, and they certainly haven't offered you any effect that would lead to an excuse or even a partial excuse as to what he was doing down there that night."); *id.* at 424 ("[The fire] was not mitigating because *you never heard any evidence about how it affected Mr. Buckner that you would think you would want to hear.* No nightmares. No effect." (emphasis added)). Counsel did not, and could not, respond to the condemning sting of the prosecution's words.

The jury recommended death after considering forty-five submitted mitigating factors, none of which mentioned the fire. Despite their ultimate sentencing recommendation, the jury did find that the fact that Buckner had grown up with an alcoholic father was a mitigating factor. Moreover, the jury penciled in three additional considerations in the catchall mitigating provision:

   A.   Brother died in fire.

    B.   Two people were involved in the murder.

    C.   Lack of parental involvement.

J.A. 302.

Following his conviction and death sentence, Buckner submitted a motion for appropriate relief ("MAR") before the state post-conviction court ("MAR court"). In support of his motion, Buckner proffered affidavits from Childers; Cynthia Neagle Maxwell, a mitigation expert; Claudia R. Coleman, Ph.D., a psychologist specializing in forensic psychology, neuropsychology, and psychological assessments; and Dr. Nathan Strahl, a board-certified psychiatrist specializing in forensic psychiatry.

First, Childers attested that while preparing for trial, he became consumed with his personal financial difficulties. As a result, he "was not able, despite [his] desire and best effort, to spend the time on Mr. Buckner's case necessary in order to develop an adequate defense at sentencing." J.A. 288. He felt that he "was not able to develop and present effective mitigating evidence on Mr. Buckner's behalf, which evidence may have dissuaded a jury from sentencing Mr. Buckner to death." *Id.* Stunningly, Childers was unaware that both mitigation specialists and neuropsychologists were available to be used for the sentencing phase:

> I should have engaged a mitigation specialist and a neurop-sychologist to examine and interview Mr. [B]uckner so that their findings could be presented to the jury. . . . [I] was unaware at the time I was representing Mr. Buckner, that both of these two types of experts were and are available to present facts and opinions to juries in the sentencing phase of death penalty cases.

*Id.*[2]

---

[2]At the MAR hearing, Bell adhered to his position that presenting psychological evidence would have undermined the sentencing strategy for two reasons. First, Bell opined that the mitigation strategy piggybacked

Second, based on her reviews of Buckner's school, medical, and prison records and interviews with his family and friends, Maxwell determined that Buckner's "home life as a child was severely dysfunctional." J.A. 307. Specifically, Maxwell noted that Buckner clearly remembered watching his father attempt to save Bobby during the fire. For an unknown reason, the fire was "more traumatic for [Buckner] than for his [twin] brother," to the extent that Buckner developed a sleepwalking disorder. J.A. 308. The family never resolved the cause of the fire, and at one point, Buckner and Carl were believed to have accidentally started it. Moreover, Buckner's father became prone to intensified drinking spells on the "anniversary" of the fire and abused Buckner's mother, who had a personal history of childhood abuse. Ultimately, Maxwell concluded that Buckner suffered "severe" psychological trauma from the fire and his father's alcoholism, and later developed post-traumatic stress disorder from these and other tragic circumstances prior to his involvement in the murder. J.A. 311-13.

Third, Dr. Coleman made the same findings concerning the traumatic events in Buckner's childhood that Maxwell did after interviewing and testing Buckner on three separate occasions, and reviewing Maxwell's notes. Coleman Aff. ¶ 3. In addition, Dr. Coleman determined that Buckner's father's alcoholism "caused him to be inattentive to [Buckner] and caused significant emotional distress." *Id.* According to Dr. Coleman, Buckner "vividly" remembered "the

---

the guilt/innocence strategy by showing that Buckner "was an extremely smart individual who was working with the police." J.A. 255. Second, Bell opined that psychological evidence would have undermined their strategy of portraying Buckner as a brave, upstanding, and moral citizen:

> And if I had tried to introduce psychologicals that stated that he was—had some psychological impairment, it would have clashed with the image we were trying to present of the kid who taught weight-lifting, who went to Boy's and Girl's Clubs, who did cross-country, who did graduate, who did go to the Marines. And we would have just been at a cross-purposes in the sense of impeaching ourselves in front of the jury.

J.A. 244. Bell conceded, however, that having low emotional maturity would not be inconsistent with being an informant. J.A. 256.

intensity of his father's mood when drinking." *Id.* Dr. Coleman also noted that when Buckner became a confidential informant, he strongly desired to perceive himself as an "undercover agent," thus likening "his position to that of his older step-brother who was a policeman and whom [Buckner] admired." *Id.* Based on her findings, Dr. Coleman ultimately concluded that the traumatic events of Buckner's youth contributed to his dependent, naive, immature, histrionic, and impulsive personality, which, in turn, led to "his involvement in the capital offense with which he was charged and of which he was later convicted." *Id.*

Fourth, Dr. Strahl, who interviewed Buckner in October and December of 1997, and reviewed Maxwell's evaluation, concluded:

I estimate that Cale Buckner's emotional maturity at the time of the crime for which he was most recently convicted corresponded to a child of 12 years. Historically, Cale Buckner demonstrated traits which, at the time of the victim's murder, revealed his need for acceptance, lack of ability to rationalize in a mature way, lack of ability to make mature decisions, and that he was easily influenced by others. In my opinion, Cale Buckner's lack of emotional maturity contributed materially to his involvement or participation in any of the crimes for which he has been convicted.

J.A. 292-93. Dr. Strahl further opined that with "time and with appropriate treatment," Buckner could become a constructive citizen. J.A. 293.

## II.

In applying the two-prong test for ineffective assistance of counsel claims under *Strickland v. Washington*, 466 U.S. 668 (1984), the majority concludes that even if counsel's performance was constitutionally deficient, Buckner did not establish prejudice arising from counsel's failure to develop mitigation evidence regarding the fire or his father's alcoholism. *See* Op. at 12-15. For the reasons that follow, I find that Buckner satisfied both elements of his ineffective assistance of counsel claim.

A.

To establish ineffective assistance of counsel under *Strickland*, the petitioner must show (1) counsel's performance was "deficient"; and (2) "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. Without articulating "specific guidelines for appropriate attorney conduct," the Supreme Court has explained that counsel's performance is "deficient" where it falls "below an objective standard of reasonableness," as measured by "prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (internal quotation marks and citations omitted). We must thus "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.

Assuming that the petitioner establishes that counsel's performance was deficient, he must then prove prejudice—i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Wiggins*, 539 U.S. at 534 (internal quotation marks and citations omitted). A "reasonable probability" refers to "a probability sufficient to undermine confidence in the outcome." *Id.* (internal citations omitted). In making this determination, we are required to "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Id.*

B.

Although the majority suggests, without deciding, that counsel's performance was constitutionally deficient, *see* Op. at 9-11, I would hold that counsel's conduct fell below an objective standard of reasonableness under the first prong of *Strickland*.

We have previously stated that counsel has the responsibility "to adequately investigate and present evidence in mitigation of guilt." *Byram v. Ozmint*, 339 F.3d 203, 209 (4th Cir. 2003) (citing *Williams v. Taylor*, 529 U.S. 362, 395 (2000)). As in *Strickland* and *Wiggins*, Buckner's claim "stems from counsel's decision to limit the scope of their investigation into potential mitigating evidence." *Wiggins*, 539 U.S. at 521 (citing *Strickland*, 466 U.S. at 673). In this context, the Supreme Court has explained that the reasonableness inquiry focuses

on "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [Buckner's] background *was itself reasonable*"—and "not whether counsel should have presented a mitigation case." *Id.* at 523 (internal citations omitted). Specifically, the Court stated in *Strickland*:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. *In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.* In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91 (emphasis added).

The record reflects that counsel became aware of the fire that killed Buckner's younger brother and his father's alcoholism during trial preparations. After consulting with the Death Penalty Resource Center, Childers retained Dr. Sultan to conduct a psychological examination. When Buckner initially rebuffed Dr. Sultan's attempt to examine him, Childers did not advise Buckner to cooperate. Instead, Childers became discouraged and simply abandoned his investigation into psychological mitigation evidence.

Without a psychological evaluation from Dr. Sultan, Bell and Childers were therefore left with the limited outpatient summary prepared by Dr. Rollins, the forensic psychiatrist who had examined Buckner in the previous year. Although counsel realized that the evaluation did not mention either the fire or Buckner's father's alcoholism, they did not follow up with Dr. Rollins, Dr. Sultan, or any other expert. In fact, Childers admitted that he was "unaware" that he could have presented expert testimony from a mitigation specialist or neuropsychologist at the sentencing hearing. J.A. 288. Counsel thus proceeded to trial without the benefit of any psychological expert tes-

timony regarding the impact of the fire or Buckner's father's alcoholism.

Set in context, counsel's decision to forego psychological mitigating factors without any competent information concerning the existence of trauma flowing from Buckner's childhood experiences was unreasonable. Despite being well aware of the obviously devastating circumstances of the fire and Buckner's father's alcoholism, counsel never procured a professional opinion addressing their psychological impact. *See Wiggins*, 539 U.S. at 524-27 (counsel's failure to expand their investigation beyond the presentence investigation report and the social services report, which detailed the defendant's history of childhood abuse, was unreasonable); *see Jennings v. Woodford*, 290 F.3d 1006, 1013-14 (9th Cir. 2002) (counsel's reliance on psychiatrist's preliminary examination, which was not meant to rule out mental defenses, was unreasonable in light of counsel's awareness of the defendant's long-time drug abuse, childhood sexual behavior, and suicide attempts); *Lambright v. Stewart*, 241 F.3d 1201, 1207 (9th Cir. 2001) (counsel's failure to obtain a psychiatric evaluation was unreasonable in light of counsel's awareness of the defendant's wartime experience and drug abuse). *Cf. Gilbert v. Moore*, 134 F.3d 642, 654 (4th Cir. 1998) (*en banc*) (counsel properly limited investigation into psychiatric issues after pretrial evaluations failed to raise any issues of serious mental or emotional problems). Instead, as Childers admitted, counsel succumbed immediately to defeatism in the face of Buckner's reluctance to present psychological mitigation evidence. J.A. 141 (Childers, stating that "I think I should have pushed that psychological issue more. It was discouraging. I felt like I was running into dead ends and maybe those roads I followed wouldn't have led to dead ends if I had had some help."); *Blanco v. Singletary*, 943 F.2d 1477, 1501 (11th Cir. 1991) (counsel's failure to investigate and present mitigation evidence was unreasonable where "[c]ounsel essentially acquiesced in [the defendant's] defeatism without knowing what evidence [the defendant] was foregoing.").

Moreover, by focusing exclusively on the guilt/innocence phase of trial, counsel doomed their chances of developing a coherent mitigation strategy, presenting expert witnesses, or fleshing out Buckner's psychological history. The 1989 version of the *American Bar Association Guidelines for the Appointment and Performance of Defense*

*Counsel in Death Penalty Cases* ("*1989 ABA Guidelines*"), which the Supreme Court has recognized as a guide for "determining what is reasonable," *Strickland*, 466 U.S. at 688, instructs attorneys to begin their preparations for both the guilt/innocence phase and sentencing phase immediately upon joining a case:

> Counsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. Both investigations should begin immediately upon counsel's entry into the case and should be pursued expeditiously.

*1989 ABA Guidelines* § 11.4.1.A, *superseded by ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* § 4.1 Commentary (rev. ed. 2003), *reprinted in* 31 Hofstra L. Rev. 913, 925 (2003) ("*2003 ABA Guidelines*").[3]

Here, counsel did "most" of their preparations for mitigation during "the last week or so of the guilt/innocence phase and then while [the sentencing hearing] was going on." J.A. 166; *see Williams*, 529 U.S. at 395 (finding ineffective assistance of counsel where counsel began preparing for sentencing one week before trial and failed to conduct

---

[3]The *2003 ABA Guidelines* further clarify that:

> Investigation and planning for both phases must begin immediately upon counsel's entry into the case . . . . Counsel must promptly obtain the investigative resources necessary to prepare for both phases, including at minimum the assistance of a professional investigator and a mitigation specialist, as well as all professional expertise appropriate to the case.

*2003 ABA Guidelines* at 925 (internal footnotes omitted). Although the *1989 ABA Guidelines*, and not the *2003 ABA Guidelines*, were in effect at the time of Buckner's trial and sentencing, I refer to the *2003 ABA Guidelines* "because they are the clearest exposition of counsel's duties at the penalty phase of a capital case . . . ." *Hamblin v. Mitchell*, 354 F.3d 482, 488 (6th Cir. 2003). As the Sixth Circuit has observed, the *2003 ABA Guidelines* merely "explain in greater detail than the [*1989 ABA Guidelines*] the obligations of counsel to investigate mitigating evidence . . . [and] do not depart in principle or concept" from *Strickland* or *Wiggins*. *Id.* at 487.

investigation into prison and social services records that would have revealed the defendant's "nightmarish childhood"). Undoubtedly, the hurried circumstances surrounding counsel's preparation for the sentencing hearing led to the "shotgun" approach they ultimately adopted in presenting a mitigation defense to the jury.[4]

Despite the deficiencies apparent in counsel's performance, the state post-conviction court, which had reviewed Buckner's MAR, nevertheless concluded that counsel's decision to abandon the investigation was reasonable based on Buckner's refusal to cooperate, his denials of psychological trauma, and counsel's personal observations of his behavior. The MAR court alternatively determined that counsel reasonably decided that psychological mitigating evidence was inconsistent with their sentencing strategy. For the reasons that follow, I conclude that the MAR court's conclusions must be rejected under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, because they rest on objectively unreasonable applications of *Strickland*. *See Humphries v. Ozmint*, 397 F.3d 206, 215 (4th Cir. 2005) (*en banc*) (federal habeas relief may not be granted "unless the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." (internal quotation marks and citations omitted)).

First, Buckner's reluctance in submitting to psychological evaluation did not absolve counsel of their duty to investigate clear warning signs of psychological trauma. The *1989 ABA Guidelines* provide that "[t]he investigation for preparation of the sentencing phase should be conducted *regardless* of any initial assertion by the client that mitigation is not to be offered." *1989 ABA Guidelines* § 11.4.1.C.l (emphasis added); *id.* at § 11.4.1 commentary ("Counsel's duty to investigate is not negated by the expressed desires of a client."). In other words, "[s]imply because a defendant objects to the development of evidence . . . does not necessarily absolve his lawyers from gathering that evidence." *Frye v. Lee*, 235 F.3d 897, 904 (4th Cir. 2000); *see also Silva*

---

[4]These problems were further exacerbated by Childers's preoccupation with his financial difficulties, which compelled him to seek withdrawal from the case.

*v. Woodford*, 279 F.3d 825, 839-40 (9th Cir. 2002) (finding ineffective assistance of counsel where counsel abandoned investigation into the defendant's family history based on his refusal to allow counsel to contact his parents); *Carter v. Bell*, 218 F.3d 581, 596 (6th Cir. 2000) (finding ineffective assistance of counsel where counsel failed to investigate mental health issues and noting that "reluctance on Carter's part to present a mental health defense or to testify should not preclude counsel's investigation of those factors"); *Blanco*, 943 F.2d at 1502 (stating that "a defendant's desires not to present mitigating evidence do not terminate counsels'[sic] responsibilities during the sentencing phase of a death penalty trial: The reason lawyers may not blindly follow such commands is that although the decision whether to use such evidence is for the client, the lawyer first must evaluate potential avenues and advise the client of those offering potential merit" (internal quotation marks and footnote omitted)).

When counsel had an opportunity to gather psychological evidence through Dr. Sultan's examination of Buckner, they did not accompany Buckner to the examination or advise him to cooperate. Nor did they follow up with Dr. Rollins, the forensic psychiatrist who initially examined Buckner, even after realizing that his outpatient summary did not address the fire or Buckner's father's alcoholism. *See Caro v. Calderon*, 165 F.3d 1223, 1228 (9th Cir. 1999) (finding ineffective assistance of counsel where counsel, who was aware of petitioner's chemical poisoning, failed to retain experts on chemical poisoning, to inform the experts who examined the petitioner that he had been poisoned, and to ask the experts about the effects of poisoning); *id.* ("All counsel had to do was ask the question 'What did all that extraordinary exposure to chemicals do to his brain?'"). Counsel also failed to take other steps in retrieving Buckner's educational, medical, military, or family records. *See 1989 ABA Guidelines* § 11.4.1.D.2.C (instructing attorneys to collect information related to the defendant's medical history, educational history, military records, employment and training, family and social history, prior correctional experiences, and religious and cultural influences); *Silva*, 279 F.3d at 847 ("[I]f a client forecloses certain avenues of investigation, it arguably becomes even more incumbent upon trial counsel to seek out and find alternative sources of information and evidence, especially in the context of a capital murder trial."). *Cf. Byram*, 339 F.3d at 210 (counsel spent "a substantial amount of time" investigating mitigation evidence by

obtaining the defendant's childhood and school records; reviewing his mother's medical records to determine possible alcohol abuse during her pregnancy; and retaining a forensic psychiatrist, forensic psychologist, private investigator, and a social worker, who actually testified about the defendant's psychosocial state during the sentencing hearing).

Although Buckner certainly demonstrated recalcitrance in submitting to psychological examination, counsel made no attempt to ensure that he was making an informed choice in foregoing such evidence. *See 1989 ABA Guidelines* § 11.4.1 commentary ("The attorney must first evaluate the potential avenues of action and then advise the client on the merits of each."). Specifically, counsel never apprised Buckner of the consequences he faced by refusing to cooperate. *See Hamblin*, 354 F.3d at 492 (finding ineffective assistance of counsel where counsel declined to investigate the defendant's mental condition upon his wishes, but did not inform him as to "the importance of mitigation to the penalty phase or the consequences of limiting the penalty phase to his unsworn statement and the testimony of [his one-time lover]"); *Emerson v. Gramley*, 91 F.3d 898, 906 (7th Cir. 1996) ("Previous cases in which a decision not to introduce evidence in mitigation has been found consistent with effective assistance of counsel have emphasized that [the] lawyer and judge warned the defendant of the consequences of the decision."). *Cf. Frye*, 235 F.3d at 905 (finding no ineffective assistance counsel where counsel "*painstakingly informed* Frye of the consequences of not involving family members in the mitigation stage" and provided some expert psychological testimony at the sentencing hearing, despite Frye's continued unwillingness to provide access to his family members (emphasis added)).

Second, counsel's decision to abandon the investigation cannot be justified by Bell's personal observations of Buckner's disposition or Buckner's belief that he had not suffered trauma. *See 2003 ABA Guidelines* at 956-57 ("Counsel's own observations of the client's mental status, while necessary, can hardly be expected to be sufficient to detect the array of conditions (e.g., post-traumatic stress disorder, fetal alcohol syndrome, pesticide poisoning, lead poisoning, schizophrenia, mental retardation) that could be of critical importance." (internal footnote omitted)); *see also Rompilla v. Beard*, 125 S. Ct. 2456, 2468-69 (2005) (noting that had counsel reviewed defendant's

prior conviction file, they would have discovered a multitude of mitigation leads, including childhood and mental health records which controverted defendant's earlier "benign" representations of his upbringing and mental state); *Carter*, 218 F.3d at 596 ("The sole source of mitigating factors cannot properly be that information which defendant may volunteer; counsel must make some effort at independent investigation in order to make a reasoned, informed decision as to their utility."). Simply put, neither counsel nor Buckner was qualified in the field of psychology or psychiatry to assess Buckner's mental health.

Third, counsel cannot rely on strategic considerations to justify their decision to forego a psychological defense, because that decision was uninformed. Counsel did not know how, if at all, the fire and Buckner's father's alcoholism had affected Buckner. *See 1989 ABA Guidelines* § 11.4.1 commentary ("Without investigation, counsel's evaluation and advice amount to little more than a guess."). In the absence of that information, they could not make a reasoned decision as to whether psychological evidence would be inconsistent with their mitigation strategy to portray Buckner as a courageous informant who risked his life to assist the police. *See Wiggins*, 539 U.S. at 525 ("[A]ny reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses . . . ."). Nor could they make an informed decision as to whether a psychological defense could be more compelling to a jury than the theory they intended to present. Because counsel prematurely abandoned the investigation, they could not make a "fully informed decision with respect to sentencing strategy." *Id.* at 528.

After reviewing the record, I therefore conclude that counsel's conduct fell far below an objective standard of reasonableness, as defined by *Strickland*, *Wiggins*, and the *1989 ABA Guidelines*, which were the then-prevailing norms of attorney conduct. To the extent that the MAR court concluded that counsel's conduct was acceptable, its justifications rested on unreasonable applications of *Strickland* and *Wiggins*. *See Williams*, 529 U.S. at 387 ("Section 2254(d) requires us to give state courts' opinions a respectful reading, and to listen carefully to their conclusions, but when the state court addresses a legal question, it is the law as determined by the Supreme Court of the United States that prevails." (internal quotation marks and citations omitted)).

Accordingly, I would hold that Buckner satisfied the first prong of *Strickland*.

## C.

Having concluded that Buckner established the objective unreasonableness of counsel's performance, I now consider whether Buckner has shown prejudice under the second prong of *Strickland*. After reviewing the record, I would hold that counsel's failure to include psychological mitigation evidence regarding Buckner's dysfunctional childhood and stunted emotional development—conditions that were certainly relevant to his moral culpability—deprived Buckner of his opportunity to present a meaningful mitigation defense. Because I find that Buckner has established prejudice under *Strickland*, I cannot join the majority.

To show prejudice, the defendant must establish that there is a reasonable probability that, but for counsel's unprofessional errors, "at least one juror would have struck a different balance" between life imprisonment and death. *Wiggins*, 539 U.S. at 537. Indeed, under North Carolina law at the time of Buckner's conviction, jurors must be unanimous in imposing the death penalty. *State v. Spruill*, 360 S.E.2d 667, 697 (N.C. 1987). Absent juror unanimity, the defendant is automatically sentenced to life imprisonment. N.C. Gen. Stat. § 15A-2000(b).

Prejudice therefore turns on whether there is a reasonable probability that the available psychological mitigation evidence would have convinced at least one juror to choose life imprisonment over death. Evidence concerning the defendant's childhood, social background, character, and mental health is highly relevant to sentencing determinations because of the "belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental problems, *may be less culpable than defendants who have no such excuse*." *Boyde v. California*, 494 U.S. 370, 382 (1990) (internal quotation marks and citations omitted). *See also Tennard v. Dretke*, 542 U.S. 274, 287 (2004) ("[I]mpaired intellectual functioning is inherently mitigating."); *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982) ("Nor do we doubt that the evidence Eddings offered was relevant mitigating evi-

dence . . . . Evidence of a difficult family history and of emotional disturbance is typically introduced by defendants in mitigation." (internal citations omitted)); *Cole v. Dretke*, 418 F.3d 494, 501 (5th Cir. 2005) (evidence of family history and emotional disturbance are relevant mitigating factors). In particular, psychological mitigation evidence can be powerful in persuading jurors to choose life imprisonment over death. *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004) (noting that jurors respond strongly to mitigation evidence that the defendant has suffered a mental illness); *Silva*, 279 F.3d at 847 (finding that counsel's failure to present "potentially compelling" evidence regarding the defendant's childhood, mental illnesses, organic brain disorders, and substance abuse was prejudicial); *Middleton v. Dugger*, 849 F.2d 491, 495 (11th Cir. 1989) (observing that psychiatric evidence "has the potential to totally change the evidentiary picture by altering the causal relationship that can exist between mental illness and homicidal behavior.").

Here, counsel's prematurely aborted investigation left behind a wealth of psychological evidence explaining how Buckner's dysfunctional childhood contributed to his criminal behavior—precisely the sort of evidence jurors find compelling. During the post-conviction investigation, Maxwell, a mitigation specialist who reviewed Buckner's school, family, and prison records, and interviewed his family and friends, determined that Buckner's "home life as a child was severely dysfunctional," particularly after the fire that killed his younger brother. J.A. 307. Buckner clearly remembered watching his father attempt to save his younger brother from the fire and reacted more dramatically to these events than did his twin brother. According to Maxwell, Buckner developed "symptoms of distress resulting in nightmares and a sleepwalking disorder" after the fire. J.A. 308. Moreover, the pre-existing familial tensions worsened after the fire. At one point, Buckner and his twin brother were believed to have started the fire—a rumor that continued to roil family relationships. In addition, Buckner's father had "significant anniversary reactions each January around the date of the fire" by engaging in escalated drinking spells. J.A. 309. Buckner saw his father beat his mother, who had a personal childhood history of abuse, and frequently fled through the window with his twin brother during these attacks.

Based on Buckner's troubled childhood, Maxwell concluded that Buckner, who had never received any professional counseling, was

"severely traumatized" by the fire and "suffered severe emotional abuse at the hands of his parents due to his father's alcoholism, his father's physical abuse of his mother, and the general neglect by both parents." J.A. 311-12. In addition, Maxwell concluded that Buckner likely "was suffering from post-traumatic stress disorder at the time of the crime" because of recent events such as his absence without leave from military service, his parents' separation, his mother's rumored homosexual relationship, his separation from his own wife, his mother's ovarian cancer, and his father's death. J.A. 313.

Dr. Coleman, a psychologist specializing in forensic psychology, neuropsychology, and psychological assessments, concurred with Maxwell's findings concerning Buckner's traumatic childhood after interviewing and testing him on three separate occasions. Coleman Aff. ¶ 3. Dr. Coleman further determined that Buckner's father's alcoholism "caused him to be inattentive to [Buckner] and caused significant emotional distress." *Id.* During his interviews with Dr. Coleman, Buckner "vividly" remembered the "intensity of his father's mood when drinking" and recalled fleeing the house with his mother and brother until his father had "passed out." *Id.* Moreover, Dr. Coleman noted that when Buckner became a confidential informant, he convinced himself that he was serving as an "undercover agent," thus likening "his position to that of his older step-brother who was a policeman and whom [Buckner] admired." *Id.*

Based on her findings, Dr. Coleman ultimately concluded that Buckner's dysfunctional background contributed to his excessively naive, immature, dependent, histrionic, and impulsive behavior, which, in turn, led to his involvement in Dow's murder:

> i.   Psychological assessment revealed that [Buckner] is a naive individual whose social interaction is highly influenced by his high dependency needs and his need for affection and acceptance. His general personality traits reflect dependent, histrionic, immature, and impulsive features. He has difficulty admitting even common weaknesses and feelings, and is immature and suggestible, viewing the world in a simplistic manner.

> j.   The type of personality style described above explains how [Buckner] could rationalize transforming his role as a

simple police informant into an idealized role as an under-cover agent. This role as an undercover agent was also consistent with that of his older police officer half-brother, whom he saw as successful, and whom he respected and attempted to emulate. It appears that he naively and immaturely immersed himself in this role, somewhat unrealistically, even wearing dramatic, stereotypical clothing when he was "working." It is my opinion that this situation led directly to [Buckner]'s association with his codefendants and ultimately, to his involvement in the capital offense with which he was charged and of which he was later convicted.

*Id.* Similarly, Dr. Strahl, the forensic psychiatrist who interviewed Buckner and reviewed Maxwell's notes about the fire and Buckner's family history, opined that Buckner's exceptional immaturity led to his participation in the murder:

[Buckner] is exceptionally immature . . . for his chronological age and was exceptionally immature in the crime(s) for which he was sentenced to death. I estimate that Cale Buckner's emotional maturity at the time of the crime for which he was most recently convicted corresponded to a child of 12 years. Historically, Cale Buckner demonstrated traits which, at the time of the victim's murder, revealed his need for acceptance, lack of ability to rationalize in a mature way, lack of ability to make mature decisions, and that he was easily influenced by others. *In my opinion, Cale Buckner's lack of emotional maturity contributed materially to his involvement or participation in any of the crimes for which he has been convicted.*

J.A. 292-93 (emphasis added).

Significantly, the post-conviction affidavits proffered by Maxwell, Dr. Coleman, and Dr. Strahl were the first and only *expert* evaluations of Buckner's psychological development following the tragic events of his youth. Although the jury heard cursory testimony from Buckner's mother and cousin regarding the factual circumstances surrounding the fire and his father's alcoholism, neither witness addressed the effects on Buckner's mental health. For this reason, the

jury needed to hear expert evidence to understand the precise psychological trauma Buckner had suffered from his childhood experiences. *See Jermyn v. Horn*, 266 F.3d 257, 311 (3d Cir. 2001) ("While the jury clearly was aware that Jermyn claimed that he suffered from a mental illness, the lack of directed and specific testimony about Jermyn's childhood and its impact on Jermyn's mental illness left the jury's awareness incomplete." (internal citations omitted)); *Caro*, 165 F.3d at 1227 ("The jury did not, however, have the benefit of expert testimony to explain the ramifications of these experiences on Caro's behavior. Expert evidence is necessary on such issues when lay people are unable to make a reasoned judgment alone."); *Cunningham v. Zant*, 928 F.2d 1006, 1017 (11th Cir. 1991) ("[W]hile [Cunningham's mother] and Cunningham mentioned the plate in Cunningham's head, trial counsel failed to substantiate the existence of this injury or its effects on Cunningham by introducing Cunningham's medical records or [Cunningham's supervisor]'s testimony witnessing the headaches."). The expert opinions proffered by Maxwell, Dr. Coleman, and Dr. Strahl thus filled this void by explaining that Buckner's dysfunctional childhood contributed to his exceptionally underdeveloped maturity level—the equivalent of that of a twelve year old—and likely caused post-traumatic stress disorder. According to the experts, these psychological defects precipitated Buckner's descent into criminal behavior. *See Smith*, 379 F.3d at 943 (although the jury heard evidence of the defendant's impulsiveness and lack of emotional control, they lacked "an *explanation* of how Mr. Smith's organic brain damage caused these outbursts of violence and caused this 'kind hearted' person to commit such a shocking crime").

Without the guidance of expert evidence, the jury was left to speculate whether Buckner had suffered psychological trauma from his childhood experiences and how, if at all, such trauma should bear on their ultimate sentencing determination. Indeed, the prosecution rightfully exploited counsel's ineptitude by pointing out that counsel had never established any psychological effects arising from Buckner's troubled childhood relevant to sentencing. Sentencing Hr'g Tr. 424, October 6, 1993 ("[The fire] was not mitigating because you never heard any evidence about how it affected Mr. Buckner that you would think you would want to hear. No nightmares. No effect."). In response, counsel, who failed to appreciate the significance of expert evidence on these issues (and therefore prematurely aborted their

investigation), did nothing to emphasize the fire or any other aspects of Buckner's troubled childhood as mitigating factors. Instead, counsel completely downplayed what little evidence was presented concerning Buckner's troubled childhood by failing to address these circumstances during closing argument or submit them to the jury as mitigating factors.

Despite counsel's failure to develop or highlight these sympathetic aspects of Buckner's life, the jury affirmatively penciled in three mitigating factors on the Issues and Recommendation Form: (1) Buckner's younger brother had died in the fire; (2) two people had been involved in Dow's murder; and (3) Buckner had a lack of parental involvement. Thus, at least one juror felt compelled to identify the fire and lack of parental involvement as mitigating factors, indicating that these circumstances were relevant to his or her determination of Buckner's moral culpability.[5] In light of the jurors' obvious interest in these circumstances and the powerful effect of psychological expert testimony in sentencing determinations, I must conclude that the now-available mitigating evidence "might well have influenced the jury's appraisal" of Buckner's appropriate punishment. *Wiggins*, 539 U.S. at 538 (internal quotation marks and citations omitted); *see also Stankewitz v. Woodford*, 365 F.3d 706, 724 (9th Cir. 2004) (considering jury's questions during sentencing deliberations regarding the possibility of life imprisonment without parole as indicative of the jury's intent to consider life).

Because counsel's ineptitude prevented the jury from hearing this evidence, the sentencing process itself was flawed. Reliability of the sentencing process, which includes effective representation in presenting a mitigation defense at the sentencing phase, takes on heightened importance in a death case. *Strickland*, 466 U.S. at 694 ("An ineffective assistance claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable, so finality concerns are somewhat weaker and the appropriate standard of prejudice should be somewhat lower."). Since death, in its finality, qualitatively differs from any term of imprisonment, "there is a corresponding dif-

---

[5]The jury's specific identification of lack of parental involvement as a mitigating factor is particularly remarkable considering that the jurors had already adopted Buckner's father's alcoholism as a mitigating factor.

ference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion); *Caro*, 165 F.3d at 1227 ("It is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase."). Without adequate process, I cannot have sufficient confidence in the death sentence imposed by the jury. *Brownlee v. Harris*, 306 F.3d 1043, 1069 (11th Cir. 2002) ("As long as the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results, our confidence is undermined." (internal quotation marks and citations omitted)).

I therefore disagree with the majority's conclusion that Buckner has not established prejudice arising from counsel's failure to investigate, develop, and present psychological expert testimony regarding the effects of the fire, his father's alcoholism, and other events during his troubled youth. Considering that the expert opinions proffered by Maxwell, Dr. Coleman, and Dr. Strahl speak to Buckner's exceptionally stunted emotional development and possible post-traumatic stress disorder, I cannot conclude that this evidence simply adds "negligible detail or credibility to mitigating factors that counsel had already presented to the jury." Op. at 17. The scant lay testimony presented during the sentencing hearing simply permitted the jury to speculate that Buckner suffered some unknown consequences because of the fire and his father's alcoholism, whereas the post-conviction expert opinions established the actual and devastating nature of the trauma Buckner suffered. In this regard, this expert evidence provided the only basis for understanding the *effects* of the psychological trauma on Buckner's moral culpability for the purposes of sentencing.

Furthermore, the majority's subjective assessment of Buckner's psychological trauma as insignificant, *see* Op. at 16-17, ignores the fact that on *this record*, at least one juror found the fire and lack of parental involvement in Buckner's life to be compelling mitigating factors. If the jury penciled in these circumstances based on what little evidence was presented at the sentencing hearing, expert testimony that Buckner had the maturity level of a twelve year old and likely suffered from post-traumatic stress disorder surely could have persuaded at least one juror to choose life imprisonment over death. Indeed, the *2003 ABA Guidelines* specifically recognize post-

traumatic stress disorder, along with other mental conditions such as schizophrenia, as factors that "could be of critical importance" in capital defense. *2003 ABA Guidelines* at 956-57. Although it is "possible that the jury could have heard it all and still have decided on the death penalty, that is not the test." *Rompilla*, 125 S. Ct. at 2469.

Despite the majority's dismissive view of the now-available mitigation evidence, I note that this was not an open-and-shut case of overwhelming guilt. Even through the sentencing phase, there was doubt as to the degree of Buckner's responsibility for the murder, as demonstrated by the fact that at least one juror affirmatively wrote "[t]wo people were involved in the murder" as a mitigating factor. J.A. 302. Thus, at least one juror was in equipose as to who actually murdered Eddie Dow. This uncertainty was undoubtedly compounded by the fact that the jurors heard testimony that Bivens, the person whom Buckner identified as the real shooter, received a sentence of life imprisonment, rather than death, for his involvement in the murder pursuant to a plea deal. Trial Tr. 395, September 14, 2003. Considering that at least one juror was still weighing the degree of Buckner's moral culpability in the murder, I find it highly likely that the jury's view of Buckner's appropriate punishment was far from being a foregone conclusion.

Turning, then, to the MAR court's similar conclusion that Buckner had failed to show prejudice, I believe that its reasoning was objectively unreasonable under *Wiggins*. In arriving at this conclusion, the MAR court rejected the expert opinions proffered by Maxwell, Dr. Coleman, and Dr. Strahl as not credible simply because they relied on information obtained from Buckner and his family following his conviction. However, the reason why this evidence only surfaced in the post-conviction proceedings was *counsel*'s ineffective performance. Counsel never emphasized the importance of the sentencing phase, choosing instead to focus exclusively on the guilt/innocence phase of trial. Nor did counsel ever impress upon Buckner and his family the significance of proffering information that could lead to mitigation evidence. As a result, neither Buckner nor his family fully appreciated the consequences of "choosing" to forego psychological mitigation evidence. Significantly, the MAR court did not find that the new information was false or that Buckner was malingering during Dr.

Coleman's psychological assessments or Dr. Strahl's forensic psychiatric examinations.

In addition, the MAR court's categorical rejection of post-conviction evidence would effectively preclude petitioners from asserting a plethora of constitutional claims that rest on evidence that should have been discovered prior to trial. Indeed, the premise of many ineffective assistance of counsel claims is that counsel failed to investigate, present a material fact, or advise a client *prior to or during* trial. The very purpose of federal habeas review is to correct constitutional errors *after-the-fact. See Wiggins*, 539 U.S. at 536 (weighing evidence adduced at trial "*and the evidence adduced in the habeas proceeding[s]*" related to petitioner's ineffective assistance of counsel claim (internal quotation marks omitted and alterations in original)).

Furthermore, the majority's attempts to rehabilitate the MAR court's credibility determination are unavailing. The majority posits that the MAR court properly rejected the expert opinions because they relied on information offered from people who had previously provided "*directly contradictory* stories to counsel prior and at trial." Op. at 13. The majority supports this proposition by pointing to Buckner's denials that he had suffered psychological trauma, counsel's investigation revealing that Buckner had a loving relationship with his parents, and Buckner's mother's testimony that Buckner had enjoyed a relatively normal childhood. *Id.* at 13-14.

However, the bare, unsubstantiated assertions by Buckner that he was well-adjusted do not cast doubt on his credibility because, simply put, he was not an expert qualified to assess his own mental health. Moreover, the fact that Buckner had a loving relationship with his parents does not necessarily contradict the experts' findings that he had suffered significant psychological trauma flowing from the fire or his father's alcoholism. Indeed, although Buckner's mother testified that Buckner had a stable childhood, she qualified her testimony regarding Buckner's childhood by declining to discuss the fire. Specifically, the full question and answer regarding Buckner's childhood is as follows:

Q:    Right, but there was nothing in [Buckner's] childhood that—*except for the death of his brother*—that was any different from any other typical teenager's?

A:    No.

Sentencing Hr'g Tr. 70, October 4, 1993 (emphasis added).

The MAR court's disposition of Buckner's ineffective assistance of counsel claim cannot withstand scrutiny even under the deferential review prescribed by AEDPA. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence."). Counsel, who exhibited signs of distress, disregard, and defeatism in performing their duties for the sentencing phase, clearly impaired Buckner's right to present a meaningful mitigation defense. In light of the readily available expert mitigation evidence that now explains Buckner's psychological and emotional development following his troubled family history, I must conclude that there is a reasonable probability that at least one juror would have chosen life imprisonment over death. Accordingly, I find that Buckner has established prejudice under the second prong of *Strickland*.

### III.

For the foregoing reasons, I would grant Buckner's petition for writ of habeas corpus on his ineffective assistance of counsel claim. I concur in the majority's opinion in all other respects.